## STATE EX REL. DULUTH CLEARING HOUSE ASSOCIATION v. DEPARTMENT OF COMMERCE, STATE SECURITIES DIVISION, AND ANOTHER.[1]

December 2, 1955.

No. 36,592.

*Eckman & Eckman,* for relator.

*Gerhard Bundlie* and *Jerome B. Simon,* for respondent Industrial Credit Plan, Inc.

*Miles Lord,* Attorney General, and *Harold J. Soderberg,* Special Assistant Attorney General, for respondent Department of Commerce, State Securities Division.

KNUTSON, JUSTICE.

Certiorari to review a decision of the Department of Commerce of the State of Minnesota granting to Industrial Credit Plan, Inc., a certificate of authority to transact business as an industrial loan

[1] Reported in 73 N. W. (2d) 790.

and thrift company in the city of Duluth under the provisions of M. S. A. c. 53.

There seems to be no dispute as to the following facts: The territory within which applicant proposes to operate is composed of the Duluth, Minnesota, area and the immediate suburbs. There is only one other industrial loan and thrift company serving this entire area and population. The approximate population of the area is 120,000 people, with an estimated 50,000 of these being employed. The business establishments consist of approximately 176 manufacturing concerns; over 586 retail establishments; about 230 wholesalers, jobbers, and distributors; and 50 service establishments.

Other types of lending institutions serving the Duluth population at the time of the hearing on this application consisted of 9 commercial banks, 28 credit associations of various kinds, 2 savings and loan associations, and 11 small loan companies. The various types of lending institutions each provide a different class of credit accommodation, running from the highest quality commercial bank loans at low rates of interest to loans of the "small loan" variety for which 36 percent interest per annum may be charged.

In addition to the above, the evidence consists largely of the opinion of Stanley A. Nelson, vice president of applicant, based on an experience of 24 years in operating this type of financial institution in other localities. He stated that in his opinion an industrial loan and thrift company serves a segment of the population who cannot borrow funds on a balance-sheet basis from commercial banks but who are deserving of credit at a much lower cost than 36 percent per annum. He testified that a conservative estimate of the number of borrowers in this credit class which his company would attract would be about one percent of the population or about 1,200 people. Placing the estimate upon an ultraconservative basis, he stated that the company would have an ultimate loan portfolio of 600 borrowers. He estimated that, after the first six months, it would have 100 borrowers with a loan portfolio of approximately $75,000. He estimated that, after the first year of operation, they would have about 200 borrowers with $150,000 outstanding and, after the second year, about

400 borrowers with about $300,000 outstanding. These estimates took into consideration the fact that one other industrial loan and thrift company operates in the Duluth area.

Respondents first contend that the order now under consideration may not be reviewed by certiorari and, further, that relator has no standing to obtain review of it. In view of the decision we arrive at on the merits, we need not now determine the technical questions raised as to the right to review.[2] Cases may be found to support almost any view.

The scope of our review in a matter of this kind is limited to a consideration of whether the Department of Commerce has kept within its jurisdiction; whether it has proceeded on an erroneous theory of law; whether its action is so arbitrary and unreasonable that it represents its will and not its judgment; or whether the decision of the department is without evidence to support it.[3] Insafor as the scope of review is concerned, the only issue in this case is whether there is evidence to support the action taken by the department.

The requirements for issuance of a certificate to transact business as an industrial loan and thrift company under M. S. A. 53.03 are identical with those required under L. 1919, c. 86, § 3 (M. S. A. 45.07), considered in State ex rel. Dybdal v. State Securities Comm. 145 Minn. 221, 176 N. W. 759. They are, as stated in the Dybdal case, (1) that the statutory requirements respecting establishment of the financial structure of the proposed company have been met; (2) that there is a reasonable public demand for such company in such location; (3) that the applicants are of good moral character and financial integrity; (4) that the probable volume of business in such

---

[2] For a comprehensive discussion of the standing of a party to get review of an administrative order, see Davis, Administrative Law, cc. 16 and 17; Davis, *Standing to Challenge Governmental Action*, 39 Minn. L. Rev. 353.

[3] State ex rel. Dybdal v. State Securities Comm. 145 Minn. 221, 176 N. W. 759; State ex rel. Saari v. State Securities Comm. 149 Minn. 101, 182 N. W. 910; State ex rel. Hardstone Brick Co. v. Dept. of Commerce, 174 Minn. 200, 219 N. W. 81; Bucko v. J. F. Quest Foundry Co. 229 Minn. 131, 38 N. W. (2d) 223; Nyberg v. R. N. Cardozo & Brother, Inc. 243 Minn. 361, 67 N. W. (2d) 821.

location is sufficient to insure and maintain the solvency of such company and the solvency of the then existing company or banks in such locality without endangering the safety of any such company or bank in the locality as a place for investing or depositing public or private money; and (5) that the company will be properly and safely managed.

Insofar as these requirements are concerned, the challenge here is only to the sufficiency of the evidence to establish a reasonable public demand.

Thus, the issues presented for our consideration narrow down to the single question of whether the evidence sustains the department's finding that there is a reasonable public demand for this new institution.

As we pointed out in State ex rel. Dybdal v. State Securities Comm. 145 Minn. 221, 224, 176 N. W. 759, 760, the words "reasonable public demand" are not easily defined. The term is one of those which defy definition applicable to all conditions and all sets of facts. We there said:

"It is difficult to give to the words 'reasonable public demand' a clearer meaning than they carry without definition. They do not necessarily imply a public outcry or agitation for additional banking facilities. They do not necessarily negative the existence of adequate banking accommodations. They suppose upon the part of the community a desire of a character so substantial as to make the bank welcome and insure an amount of business sufficient to promise it success. The demand may come from the natural desire of the community and upon its own initiative, or it may be the result of propaganda. The requirement of paragraph 2 complements those of paragraph 4. Conceivably the commission might find the fact included within paragraph 2 and fail to find those included within paragraph 4, or vice versa, and in either case the application would be denied. Paragraph 2 intends that a bank shall come to a locality because of a desire for it and that it shall not be foisted upon the community when there is no reasonable wish for it there."

The question now arises: Just how do you prove reasonable public demand? What quantum of proof is necessary in order to sustain the department's findings? It is conceivable that, in a comparatively small community such as we had under consideration in the Dybdal case where sentiment is apt to crystalize quickly and a large segment of the population would take an interest one way or another, it would be comparatively easy to determine whether there was a desire, at least on the part of a large percentage of the people, to have a new bank or an institution such as is involved here. It is also quite likely to be true that another group of people would be opposed to the establishment of the bank or financial institution. However, when we come to our larger metropolitan areas, we have quite a different problem. Conceivably it would be quite simple to parade a few people or a few dozen citizens before the department to state that they desired such an institution, and an equal number probably would appear on the opposite side. It might be possible to procure petitions signed by a few or even a large number of citizens. But to get a cross-section expression of opinion which would reflect a desire on the part of the community for the institution that would be at all representative is quite another thing. We believe that the term used by the legislature must be given a meaning that makes it possible to carry out the manifest object of the statute. The requirements of the statute are intended for the protection of the public. We should not so construe the act that it becomes impossible for the department to perform the functions delegated to it by the legislature. Responsibility for the findings of fact rests on the department, and we should not interfere unless the evidence falls so far short of what is required that it can reasonably be said that the findings are arbitrary or unreasonable and that they represent the will of the department and not its judgment.[4]

---

[4]State ex rel. Saari v. State Securities Comm. 149 Minn. 101, 182 N. W. 910.

Apparently our decision in the Dybdal case is the only one to be found anywhere wherein an attempt has been made to define the term "reasonable public demand."[5]

In the field of marketing we think that it must be evident that, in determining whether there is a reasonable public demand for merchandise of a certain type, the potential market would be of paramount importance. In determining whether there was a potential market, such things as population, occupation and income of the citizenry, and existing competing establishments would largely constitute the evidence upon which the final decision would rest. In the field of law we should not be completely unrealistic. Nor should we establish barriers so difficult to hurdle that it is impossible for the department to comply with the mandate of the statute. Where the evidence as a whole reasonably justifies the inferences the department has drawn in arriving at a decision, we should not interfere. We therefore are of the opinion that, in determining whether there is a reasonable public demand for an industrial loan and thrift company so as to justify issuance of a certificate to transact business as such by the Department of Commerce under the provisions of M. S. A. 53.03, the department may take into consideration the potential market, including such evidence as population of the area served, occupation and income of the inhabitants of the area, existing competing establishments, and other evidence of a similar nature. So viewed realistically, the evidence presented was sufficient to justify the inference that from the potential market there is a desire on the part of the people for the services offered by applicant and, therefore, that there is a reasonable public demand. In determining whether the necessary facts exist in a case of this kind, the department must be allowed considerable latitude.

Affirmed.

---

[5]See, 9 C. J. S., Banks and Banking, § 7; 36 Wd. & Phr. (Perm. ed.) p. 366.