# IN RE APPLICATION OF WILLIAM JACKSON AND OTHERS FOR CERTIFICATE AUTHORIZING BURNSVILLE STATE BANK TO TRANSACT BUSINESS v. VALLEY NATIONAL BANK OF EAGAN TOWNSHIP AND OTHERS.

152 N. W. (2d) 472.

July 28, 1967—No. 40,161.

*Thuet & Todd,* for relators.

*Oppenheimer, Hodgson, Brown, Wolff & Leach, Sherman Winthrop,* and *Steven J. Olson,* for respondent Valley National Bank of Eagan Township.

*Daniel John O'Connell,* for respondent Savage State Bank.

ROGOSHESKE, JUSTICE.

Relators submitted an application to the State Commerce Commission requesting a certificate authorizing the proposed Burnsville State Bank to transact business in the village of Burnsville. Several banks in the area where the proposed bank would be located opposed the issuance of this certificate. After a full hearing extending over a period of 5 days, the application was denied upon a finding that the applicants, as required by Minn. St. 45.07, "failed to establish that there is a reasonable public demand for the proposed bank."[1]

---

[1] Minn. St. 45.07 requires the applicants to establish that (1) they are of

The sole issue upon this certiorari review is whether there is substantial evidence in the record to support the commission's conclusionary finding of fact that at the time of the hearing there was no reasonable public demand for the proposed bank. Under the rules governing the scope of review of fact issues, the weight to be given the facts and circumstances, as well as the inferences to be drawn from them, is for the commission. Since the finding turns largely on an assessment of the relative credibility of witnesses whose testimonial demeanor was observed only by the commission, we do not substitute our judgment on whether the conclusion drawn is the right one or whether a different conclusion would be better supported. We may reverse the commission's finding only if no reasonable person could make such finding in response to the evidence presented.[2]

This court has repeatedly endorsed an early statement as to what is comprehended by the words "reasonable public demand." In State ex rel. Dybdal v. State Securities Comm. 145 Minn. 221, 224, 176 N. W. 759, 760, it was stated:

"It is difficult to give to the words 'reasonable public demand' a clearer meaning than they carry without definition. They do not necessarily imply a public outcry or agitation for additional banking facilities. They do not necessarily negative the existence of adequate banking accommodations. They suppose upon the part of the community a desire of a char-

---

good moral character and financial integrity; (2) there is a reasonable public demand for a bank in the proposed location; (3) the organization expenses paid by the subscribing shareholders do not exceed the necessary legal expenses incurred in drawing incorporation papers, publication, and recording; (4) the volume of business in the location is sufficient to insure and maintain the solvency of the new bank and the solvency of the then existing banks in such locality without endangering the safety of any bank in the locality as a place of deposit of public and private money; and (5) the commission is satisfied that the proposed bank will be properly and safely managed. The commission assigned only the failure to prove requirement (2) as a ground for denial. Although the proof with respect to requirements (1), (3), and (5) were undisputed, there was considerable testimony introduced challenging the applicants' proof of requirement (4).

[2] See, 1 Dunnell, Dig. (3 ed.) § 397b.

acter so substantial as to make the bank welcome and insure an amount of business sufficient to promise it success. The demand may come from the natural desire of the community and upon its own initiative, or it may be the result of propaganda."

In State ex rel. Duluth Clearing House Assn. v. Dept. of Commerce, 245 Minn. 529, 533, 73 N. W. (2d) 790, 794, it was emphasized:

"* * * We believe that the term used by the legislature must be given a meaning that makes it possible to carry out the manifest object of the statute. The requirements of the statute are intended for the protection of the public."

Thus, in determining whether a "reasonable public demand" is established in any case, it is required that these words be given a meaning which will promote the legitimate interest of the community as a whole in having a sound banking structure, reasonably competitive and fully adequate for the needs of the community. In making this determination, the following factors are among those that should be considered: (1) Number of banks already serving the area [3] in which the proposed bank would locate; (2) size of area; (3) population of area; (4) wealth of residents of area; (5) commercial and industrial development of area; (6) potential growth of area; (7) adequacy of the services being provided by existing banks compared to the needs of residents and the services to be offered by proposed bank; (8) capability of existing banks to handle potential growth of the area; (9) convenience of the location of existing banks to residents of the area as compared to convenience of the proposed bank; (10) size of banks in area; (11) dates when the banks in the area were established; and (12) the number of persons in area who desire to use the proposed bank and the amount of business they would generate.[4]

---

[3] The relevant area is one determined primarily by economic considerations and is not necessarily a geographic or political unit. See, e. g., Application of Howard Sav. Inst. of Newark, 32 N. J. 29, 159 A. (2d) 113.

[4] See, In re Application of Gustafson, 270 Minn. 348, 133 N. W. (2d) 843; In re Application of Burrill, 262 Minn. 270, 114 N. W. (2d) 688; State ex rel. Duluth Clearing House Assn. v. Dept. of Commerce, 245 Minn. 529,

As of the time the hearings concluded on May 21, 1965, the commission could reasonably have found the following facts: [5] The proposed bank would be a small one located southeast of the intersection of U. S. Highway No. 35W and Minnesota Highway No. 13 in the village of Burnsville, a remote suburb of the Twin Cities. Burnsville is economically a part of a larger area which includes the adjoining municipalities and has distinct ties with the Twin Cities. This area was formerly farmland and is presently sparsely populated. Existing population is generally scattered sporadically throughout the area in small concentrations of residences surrounded by large areas of farmland.

Burnsville was incorporated as a village in 1964. Its population rose from about 2,700 in 1960 to about 10,500 at the time of the hearing. This rate of growth is likely to decrease as property taxes have recently been greatly increased. Less than 20 percent of its area is presently developed. It is almost exclusively a residential area, populated by persons who work in the Twin Cities. There has been virtually no industrial development outside of a huge Northern States Power Company plant, which accounts for about 50 percent of the assessed valuation in Burnsville. There has been relatively little commercial development, and what there is has been generally on a very small scale.

There is no bank physically located within the village of Burnsville, but there are at least five within a relatively short distance of its borders. The services provided by these banks are adequate for the needs of the residents of Burnsville. Moreover, its residents have access to the numerous banks in the Twin Cities, where they work. Two banks recently established about 3 miles from the site of the proposed bank offer the

---

73 N. W. (2d) 790; State ex rel. Saari v. State Securities Comm. 149 Minn. 101, 182 N. W. 910; State ex rel. Dybdal v. State Securities Comm. 145 Minn. 221, 176 N. W. 759; Stokes, *Public Convenience and Advantage in Applications for New Banks and Branches,* 74 Banking L. J. 921; Comment, 12 U. of Detroit L. J. 75.

[5] The commission in this case merely specified in its conclusion that there was no reasonable public demand, without either indicating its reasons therefor or making any findings of specific facts to support it. This practice not only makes our review of the decision more difficult, but appears contrary to the requirements of Minn. St. 15.0422.

same services as contemplated by the latter. The Savage State Bank was established in 1960 and the Valley National Bank in 1963. Each has total assets of under $3 million. The Savage State Bank just recently showed a profit, the Valley National is operating at a loss, and neither has paid any dividends to its stockholders. Residents of Burnsville can reach either bank in 15 minutes or less, and both banks draw a substantial amount of their business from Burnsville residents. The Comptroller of the Currency has decreed a moratorium on the establishment of any new national banks in the Twin Cities metropolitan area because of the large number of banks newly established in this area.

The foregoing facts, in conjunction with the opinions expressed by respondents' expert witnesses that there was no reasonable public demand for a new bank in Burnsville, provided ample evidence to support the commission's finding and was not overborne by the evidence to the contrary submitted by applicants. The fact a mail poll made on applicants' behalf of 1,010 residents of Burnsville indicated 271 would use the proposed bank, 265 would not, 15 were undecided, and 459 did not reply, was merely one factor to be considered by the commission.

Judged by the test of reasonableness, we hold that there is substantial evidence in this record to support the commission's determination that applicants failed to prove a reasonable public demand in the Burnsville area at the time of the hearing to justify establishing the proposed bank.

Affirmed.

PETERSON, JUSTICE (concurring specially).
I concur in the result.