## IN RE APPLICATION OF HERSCH HODGE AND OTHERS FOR CERTIFICATE AUTHORIZING INCORPORATION AS CITIZENS SAVINGS AND LOAN ASSOCIATION v. ROCHESTER SAVINGS AND LOAN ASSOCIATION AND OTHERS.

207 N. W. 2d 538.

May 18, 1973—No. 43495.

---

*Schacht, Kerr & Schacht* and *George R. Kerr,* for relator Rochester Savings and Loan.

*Michaels, Bishop, Seeger & Rosenblad* and *Franklin Michaels,* for relator Olmsted Federal.

*Hunt, DeVinny & Young* and *Robert DeVinny,* for relator Home Federal.

*Dennis R. Peterson,* for applicants.

*Warren Spannaus,* Attorney General, *Curtis D. Forslund,* Solicitor General, and *Steven M. Gunn,* Special Assistant Attorney General, for respondent commission.

PER CURIAM.

Certiorari has been granted on the petition of three savings and loan associations to review an order of the Commerce Commission granting applicants a certificate authorizing Citizens Savings and Loan Association to transact business at Northbrook Shopping Center in the city of Rochester. The issue is whether the applicants have sustained their burden of satisfying the requirements prescribed by Minn. St. 51A.03, subd. 3, the pertinent provisions of which are as follows:

"If upon the hearing it appears that the applicants are of good moral character and financial integrity, that there is a reasonable public demand for this association in the location specified by the application, that there is a reasonable probability of the proposed association's usefulness and success, that such association can be established without undue injury to the properly conducted, existing financial institution in the locality, and that such

association will be properly and safely managed, the application may be granted; otherwise it shall be denied."

In December 1970, the Commerce Commission denied a charter to these applicants who thereupon reapplied and were accorded a new hearing in April 1971. The application was granted in November 1971 by a divided commission. Because the vote was not unanimous and because the hearing examiner's findings can only be construed as unfavorable to the applicants, we find our function a difficult one. As we have stated on other occasions, if the responsibility for passing on the application were ours we might well have come to a different conclusion. However, the scope of our review is limited to the issues of whether the Commerce Commission has kept within its jurisdiction; whether it has proceeded on an erroneous theory of law; whether its action is so arbitrary and unreasonable that it represents its will and not its judgment; or whether the decision of the commission is without evidence to support it. State ex rel. Duluth Clearing House Assn. v. Dept. of Commerce, 245 Minn. 529, 531, 73 N. W. 2d 790, 792 (1955). While we believe that the propriety of granting the charter is not entirely free from doubt, we have concluded that there is adequate probative evidence to justify the commission's decision and therefore affirm.

1. The relator-objectors complain that the five applicants have not adequately proved their "good moral character and financial integrity" except by their own self-serving testimony. The parties stipulated as to the qualifications of one of the applicants. As to the others, the examiner made no findings but the commission found them to be of good moral character and financial integrity. An examination of the background, professional and business standing, and civic activities of the applicants supports the commission's conclusion with respect to the applicants' standing in the community. There is no suggestion in the record that they do not enjoy a good reputation, and we are of the opinion they have sustained their burden in this respect. The same may be said of their financial integrity. Their financial

statements disclose a combined worth of something approaching $800,000, which would appear to satisfy that requirement of the statute.

2. On the issue of whether there was a reasonable public demand for a new savings and loan association, competing surveys came to conflicting conclusions. "[T]he words 'reasonable public demand' * * * do not necessarily imply a public outcry or agitation for additional banking facilities. They do not necessarily negative the existence of adequate banking accommodations. They suppose upon the part of the community a desire of a character so substantial as to make the bank welcome and insure an amount of business sufficient to promise it success." State ex rel. Dybdal v. State Securities Comm. 145 Minn. 221, 224, 176 N. W. 759, 760 (1920). Rochester presently is served by four banks and three savings and loan associations. None, however, is located in the site proposed by applicants, in the northeast area of the city, where a large growth in population has been experienced. There has been no new savings and loan association chartered in Rochester since 1910, during which time the population has expanded from 7,800 people to 53,000 people. We are satisfied from a consideration of these facts, together with the rapid expansion of the economy and employment in the community, that the commission was justified in finding a reasonable public demand for the proposed association in the location contemplated. In re Application of Burrill, 262 Minn. 270, 273, 114 N. W. 2d 688, 690 (1962).

3. The examiner made no findings as to whether the proposed association could be established without undue injury to existing financial institutions, and the commission made short shrift of that statutory criterion. The thrust of the objectors' argument on this issue is essentially that whatever business the proposed association enjoys will be at the expense of existing associations which would otherwise share that business. This is not the kind of "injury" which we believe the statute contemplated. As the applicants point out, if they achieve deposits of $1,500,000 in

their first year, which seems to be their goal, it cannot seriously affect the economic health of other savings and loan institutions whose deposits have grown from $52,000,000 in 1960 to $116,000,000 in 1970.

4. A more troublesome question arises over the issue of whether' applicants have satisfied the statutory requirements that they show a reasonable probability of usefulness and success and that they will properly and safely manage the association. The hearing examiner found that the applicants lacked a working knowledge of Federal and state regulations which apply to savings and loan associations, did not understand the function of an expense fund out of which expenses would initially be paid, and were unaware of their duties and contributions to the board of directors. The examiner was particularly critical of the qualifications of the proposed president, the proposed treasurer, and the proposed office manager. The examiner's expressed concern is not without support in the record. Although these officers had considerable business experience and some banking background, they did not appear to have a solid grasp of the operations of a savings and loan association. According to one witness, their duties required among other things a working knowledge of savings accounts, mortgage loans, real estate appraising, fiscal operations, investment portfolio, personnel management, public relations, and advertising. The commission seems to have placed some reliance on the fact the association would apply for and secure insurance from the Federal Savings and Loan Insurance Corporation. While the weak showing of collective experience of the applicants in managing a savings and loan association gives us some pause, competent management will have to be demonstrated to qualify for the insurance which we are advised will be obtained before the association actually begins doing business under its charter.[1] Under these circumstances we cannot

---

[1] In Section III, paragraph 1, under the title "Management," the commission's amended findings of November 17, 1971, contain the following statement: "The applicants, as members of the board of directors, will

say as a matter of law that the applicants have not proved the association will be "properly and safely managed." There is merit in the applicants' argument that the identity of the office manager cannot be established with finality until the association is ready to do business. When that time arrives, we have no reason to doubt that whoever the applicants select will be a person with adequate experience and background in the savings and loan business. Accordingly, we affirm.

Affirmed.

require the association to apply for and secure insurance coverage from the Federal Savings and Loan Insurance Corporation."