IN RE APPLICATION OF WEST ST. PAUL STATE BANK FOR PERMISSION FOR CHANGE OF ADDRESS.
WEST ST. PAUL STATE BANK v. SIGNAL HILLS STATE BANK AND ANOTHER.

223 N. W. 2d 793.

November 8, 1974—No. 44331.

Douglass, Bell, Donlin, Shultz & Petersen and James M. Shultz, for relator.

Maun, Hazel, Green, Hayes, Simon & Aretz and Jerome B. Simon, for respondent bank.

Warren Spannaus, Attorney General, Jonathan H. Morgan, Solicitor General, and Steven M. Gunn, Special Assistant Attorney General, for respondent Department of Commerce.

Heard before Sheran, C. J., and Kelly, Todd, MacLaughlin, and Knutson, JJ., and considered and decided by the court en banc.

KNUTSON, JUSTICE.*

This is a proceeding for review by certiorari of a decision of

---

* Retired Chief Justice acting pursuant to Minn. St. 2.724.

the Minnesota Commerce Commission[1] reversing an approval by the commissioner of banks of the right of relator, West St. Paul State Bank, to move its location.

The facts are not seriously in dispute. West St. Paul State Bank (hereinafter West) has been engaged in the banking business at 918 South Robert Street, West St. Paul, since 1923. Its original charter issued in 1923, as well as a replacement charter issued in 1964, named the city of West St. Paul as the bank's place of business but did not include any street address.

Respondent Signal Hills State Bank does business in the city of West St. Paul as well. West is located in the northern part of the city and Signal Hills State Bank (hereinafter Signal) is located in the central part of the city. The city is composed mainly of two major business areas, the southern and northern portions thereof. West presently serves the older, more-established northern portion of the city while Signal serves a rapidly growing and younger southern portion of the city. In November 1972, West filed a written application with the commissioner of banks seeking approval to move its bank to 64 East Thompson Avenue, which would place it in the southern portion of the city and, it is claimed by Signal, in competition with it.

Pursuant to the bank commissioner's past administrative practice, a hearing was held to determine whether the proposed move would affect the solvency of West or any other bank and Signal was permitted to appear and cross-examine West's witnesses as well as to submit evidence of its own. Eventually the commis-

---

[1] Apparently review of the action of the Commerce Commission in this court may be had by either certiorari or an appeal to the district court under Minn. St. 15.0424, the Administrative Procedure Act. In the case of Bryan v. Community State Bank of Bloomington, 285 Minn. 226, 230, 172 N. W. 2d 771, 774, 56 Minn. L. Rev. 621 (1969), we said: "* * * Thus, review under the Administrative Procedure Act is optional, and traditional methods, such as certiorari under § 45.07, are still available. In the instant case, therefore, applicants proceeded properly in appealing to the district court."

sioner found that the proposed move would not endanger the solvency of West or Signal and gave his approval.

A request for review by the Commerce Commission was granted and resulted in a reversal of the commissioner of banks. The holding of the Commerce Commission was:

"That the Commissioner of Banks of the State of Minnesota is authorized and empowered to approve or deny the change of location of any existing bank in the State of Minnesota when such change of location is within the same municipality.

"That the burden of proof on the issue of whether the proposed change in location would endanger the solvency of the Signal Hills State Bank or any other bank in the area should properly have been on the petitioner, the West St. Paul State Bank.

"That the issue of the existence of a reasonable public demand for the West St. Paul State Bank at 64 East Thompson Avenue, West St. Paul, was a proper issue and should have been proven by the petitioner."

Based on these findings, the commission ordered a new hearing to determine whether there was a reasonable public demand for West's services at the proposed new location and whether the relocation of West would endanger the solvency of it or of Signal.

Determination of these questions rests mainly on the construction of Minn. St. 45.03 and 47.10.

A brief review of the historical background of these statutory provisions may be of some help.

G. L. 1879, c. 109, established many of the rules governing banks and financial institutions. Section 27, subd. 2, which deals mainly with the right of the bank to own and hold real estate, contains the following provision:

"* * * [I]t shall be lawful for any such corporation, with the approval in writing, and under the seal of the Public Examiner, to change its location, within the limits of any city or town wherein it may be established * * *."

In addition to the above statement, the original provision from which it is taken also contains the following provision:

"* * * [I]n effecting such change of location, such corporation owning a banking house and lot, may purchase such additional plot under the provisions of subdivision one (1) of this section as the corporation may require; and such banking house and lot previously owned and occupied shall be sold, as provided in subdivision two (2) of this section, concerning real estate acquired in satisfaction of debts."

Thus it seems clear that the original provision from which Minn. St. 47.10 has its roots dealt with the right of the bank to hold or acquire real estate upon a change from one location to another.

In R. L. 1905, § 2976, which also deals with the "Right to acquire and hold real estate," the language of the original provision was changed to read:

"* * * Any such corporation may change its location, dispose of its place of business, and acquire another, upon the written approval of the examiner."

It is to be noted that in the 1905 revision, the language "within the limits of any city or town wherein it may be established" was eliminated.

Minn. St. 47.10 is virtually identical to the 1905 revision except that the commissioner of banks has been substituted for the examiner as the one who is to approve such move. This change came about by virtue of L. 1941, c. 37, § 1.

It would seem that after the 1905 revision, as well as under the present § 47.10, the then examiner and now commissioner may approve a change of the location of a bank whether it be within or without the same municipality where the bank is located when the application is made. There seems to be some confusion as to what the proper procedure is when a bank wishes to move its location. In the case of Plunkett v. First Nat. Bank of Austin, 262 Minn. 231, 246, 115 N. W. 2d 235, 245 (1962), in

which application was made to change the name of a trust company and also to be permitted to move from Albert Lea to Austin, we said:

"* * * [D]etermination of this question appears to have been taken over by the Department of Commerce under § 45.04. The procedure for making such determination was recognized as valid by the attorney general in opinions furnished at the time the Securities Commission performed the functions now exercised by the Department of Commerce."

As part of the reorganization act of 1925 (L. 1925, c. 426, art. 8, § 1) the Department of Commerce was created. The Commerce Commission was created under this act and consists of the commissioner of banks, the commissioner of insurance, and the commissioner of securities. It is organized in three divisions: Banking division in the charge of the commissioner of banks; insurance division in the charge of the commissioner of insurance; and a securities commission in the charge of the commissioner of securities. There is no doubt but what the commissioner of banks is given extensive authority under c. 46 of our statutes to supervise and regulate banks.

However, § 45.03, defining the powers and duties of the Commission of Commerce, provides among other things:

"* * * The commission shall review, and may affirm, reverse, modify, amend, or abrogate all quasi-judicial acts of a single commissioner upon written request and application of the party aggrieved, this review to be held after such reasonable notice as the commission shall prescribe."

In the case now before us, such review of the approval of the commissioner of banks was requested by Signal and the commission did reverse the commissioner of banks and ordered a new hearing as to two of the criteria involved in establishing a new bank. The crucial question in this case really comes down to a determination of whether the commissioner of banks' approval under § 47.10 or the decision of the Commerce Commission under

§ 45.03 controls. Unless we are going to read out of § 45.03 the right of the commission to reverse the commissioner of banks, it would seem that upon a review a decision of the Commerce Commission is controlling. The language is clear and it would seem quite obvious that the approval of the commissioner of banks of a right to move from one location to another is a quasi-judicial act, and therefore the Commerce Commission was well within its powers when it reversed the commissioner of banks.

Thus it would seem that under § 47.10 the commissioner of banks initially has the right to approve or disapprove an application to move an existing bank to a new location. While there has been some attempt to read into the present statute the provisions which were contained in the 1879 statute that the move can be approved only if within the same municipality or township, the present statute does not contain such limitations. If there is no request for review by the Commerce Commission, the decision of the commissioner of banks would no doubt be controlling. If, however, there is a request for a review, as there was here, a decision of the Commerce Commission reversing the commissioner of banks is controlling.

The question then becomes: What are the criteria for approving or disapproving the moving of an established bank from one location to another? The criteria for permission to establish a new bank are found in § 45.07, which reads in part:

"If the applicants are of good moral character and financial integrity, if there is a reasonable public demand for this bank in this location, if the organization expenses being paid by the subscribing shareholders do not exceed the necessary legal expenses incurred in drawing incorporation papers and the publication and the recording thereof, as required by law, if the probable volume of business in this location is sufficient to insure and maintain the solvency of the new bank and the solvency of the then existing bank or banks in the locality without endangering the safety of any bank in the locality as a place of deposit of public and private money, and if the department of commerce is sat-

isfied that the proposed bank will be properly and safely managed, the application shall be granted otherwise it shall be denied."

In moving an established bank to a new location, some of these criteria may already be established. Thus, from past experience, the commissioner of banks in the first instance and the Commerce Commission on review could undoubtedly take it as established that the applicants are of good moral character and financial integrity. The two crucial issues that would seem to be present under the requirements for establishing a new bank when it involves the moving of an established bank to a new location are whether the move will affect the solvency of existing financial institutions in the area to which the established bank wishes to move, and whether there is a reasonable public demand for another bank in this locality. These are the two criteria the Commerce Commission ordered a rehearing on, which it seems was entirely proper.

It must be apparent that the impact upon financial institutions already existing in a certain locality is as great when an established bank is permitted to move into that territory as if a new bank were chartered. Possibly it is even greater where, as here, the bank does not move a great distance from its former location. It may well take some of its old customers with it and acquire some of the potential customers of existing institutions. Thus it seems to us that the same inquiry into the possible effect of the move should be made as if a new bank sought a charter.

The question remains: Where does the burden of proof lie to establish these criteria? In the case of an application for a new charter, clearly the burden of proof lies on the applicant to establish the prerequisites under § 45.07. In the case of Wesely v. Minnetonka State Bank, 293 Minn. 386, 198 N. W. 2d 158 (1972), we held that the evidence sustained the commission's conclusion that the evidence failed to satisfy three of the five expressed statutory requirements under § 45.07. We said (293 Minn. 388, 198 N. W. 2d 160) :

"* * * A failure of proof with respect to any one of the essential statutory requirements, when supported by the record, justifies a denial by the commission and an affirmance by a reviewing court."

In Application of Burrill, 262 Minn. 270, 114 N. W. 2d 688 (1962), we followed the same rule.

In view of the fact that the burden of proof lies upon the applicant for a new bank charter, we can perceive of no reason why the burden should not also rest upon the applicant who wishes to move an established bank into a new territory where there are other existing financial institutions.

Affirmed.

TODD, JUSTICE (concurring specially).

I concur in the affirming opinion herein except that portion thereof which seeks to apply the standard of Minn. St. 45.07 applicable to an application for a new bank charter as the criteria for a change of location pursuant to Minn. St. 47.10.

In approving the statutory criteria we necessarily take with it the interpretations that our court has placed on the statutory criteria. I am particularly concerned with the "reasonable public demand" criteria. We have many decisions attempting to rationalize these words. In State ex rel. Dybdal v. State Securities Comm. 145 Minn. 221, 224, 176 N. W. 759, 760 (1920), we said:

"It is difficult to give to the words 'reasonable public demand' a clearer meaning than they carry without definition. They do not necessarily imply a public outcry or agitation for additional banking facilities. They do not necessarily negative the existence of adequate banking accommodations. They suppose upon the part of the community a desire of a character so substantial as to make the bank welcome and insure an amount of business sufficient to promise it success. The demand may come from the natural desire of the community and upon its own initiative, or it may be the result of propaganda."

In addition, in In re Application of Jackson, 277 Minn. 293,

295, 152 N. W. 2d 472, 474 (1967), we set forth the following considerations to be made in interpreting this phrase:

"* * * (1) Number of banks already serving the area in which the proposed bank would locate; (2) size of area; (3) population of area; (4) wealth of residents of area; (5) commercial and industrial development of area; (6) potential growth of area; (7) adequacy of the services being provided by existing banks compared to the needs of residents and the services to be offered by proposed bank; (8) capability of existing banks to handle potential growth of the area; (9) convenience of the location of existing banks to residents of the area as compared to convenience of the proposed bank; (10) size of banks in area; (11) dates when the banks in the area were established; and (12) the number of persons in area who desire to use the proposed bank and the amount of business they would generate."

Obviously, in examining these standards they have little application to an existing bank. The objecting bank argues that since there is a new trade area the application should be considered as an application for a new charter. It should be pointed out that the proposed move involves a change of physical location of approximately two miles within the city of West St. Paul.

It is a fiction to argue that there were separate trade territories of these banks who were only a mile apart before. Both serve the same basic trade area. Admittedly, the petitioning bank was somewhat oriented to a northern part of the community and the objector had a slight orientation to the southern part of the community. The fact of the matter is that the residential and business areas of this community are served presently by both banks.

Consequently, if the commission is to set a standard, and I agree it has a right to do so, I would change the terminology and take out of the standard the question of public demand. A reasonable demand test, oriented basically to the customers of the

petitioning bank, recognizing its needs to serve them, should be adopted. It does not appear to me that there is a great deal of public concern in this move. Both banks have substantial footings, and I think it is difficult for the objector to establish that either bank's solvency will be affected by the move.

I would limit the evidence on this question of reasonable demand to the survey of the present customers of the petitioning bank since their attitude on the move could have the most substantial effect on the solvency of the bank. Further, if the objecting bank can produce a survey of its own customers that a large number of them would change their banking business to the petitioning bank at its new location, this would be evidence to be considered as affecting the solvency of the objecting bank. I think it would be much more appropriate to limit the area of inquiry, as I have stated, rather than the broad ramifications which accompany the criteria for the establishment of a new bank within a given area.

OTIS, JUSTICE (concurring specially).

I join in the concurring opinion of Mr. Justice Todd.

PETERSON, JUSTICE (concurring specially).

I join in the concurring opinion of Mr. Justice Todd.

YETKA, JUSTICE (concurring specially).

I join in the concurring opinion of Mr. Justice Todd.

KELLY, JUSTICE (dissenting).

The effect of the affirming opinion is to vest in the Commerce Commission the power to adopt rules and regulations governing the relocation of banks within the same municipality without any statutory authority for doing so. Indeed, that opinion would in effect permit the commission to adopt rules and regulations contrary to the statutes governing administrative procedures on an appeal from the consent of the commissioner of banks to the relocation of West within the same city for which it was chartered.

The Minnesota Legislature has enacted a whole network of statutes pertaining to the creation and regulation of banks and other financial institutions. Minn. St. c. 45 established the Commerce Commission composed of the commissioner of banks, the commissioner of insurance, and the commissioner of securities, and § 45.03 states that one of the powers and duties of the commission is to act upon "applications for the organization and establishment of *new* financial institutions under sections 45.04 to 45.08." (Italics supplied.) Sections 45.04 to 45.08 set forth the procedures for the application for and issuance of new bank charters. Section 45.07 sets out the criteria for issuing a new bank charter and reads in part:

"If the applicants are of good moral character and financial integrity, if there is a reasonable public demand for this bank in this location, if the organization expenses being paid by the subscribing shareholders do not exceed the necessary legal expenses incurred in drawing incorporation papers and the publication and the recording thereof, as required by law, if the probable volume of business in this location is sufficient to insure and maintain the solvency of the new bank and the solvency of the then existing bank or banks in the locality without endangering the safety of any bank in the locality as a place of deposit of public and private money, and if the department of commerce is satisfied that the proposed bank will be properly and safely managed, the application shall be granted otherwise it shall be denied."

Chapter 47 consists of a number of statutes which pertain to financial corporations in general. The term "financial corporations" includes banks, savings banks, trust companies, and building and loan associations. See, § 47.01.

The key statute to be construed here is Minn. St. 47.10, which reads:

"Save as otherwise specially provided, the net book value of

land and buildings for the transaction of the business of such corporation, including parking lots and premises leased to others, shall not be more than as follows, assets other than cash being taken at cash market value; for a bank or a trust company 40 percent of its existing capital and surplus; and upon written approval of the commissioner of banks, 60 percent of its existing capital and surplus; for a savings bank, 50 percent of its net surplus; for a building and loan association, five percent of its net assets. Any such corporation may change its location, dispose of its place of business, and acquire another, upon the written approval of the commissioner of banks. With the exception of annual amortization charges which are made in accordance with such rules and regulations as the commissioner may prescribe, no state bank or trust company shall decrease the actual cost of such investment as shown on its books by a charge to any of its capital accounts unless approved by the commissioner."

A fair reading of that statute gives any bank the right to relocate within the same municipality where it was chartered provided the net book value of its land and buildings is within the 40 percent requirement or 60 percent if approved by the commissioner. Because of the placement in § 47.10 of the requirement of obtaining written approval of the relocation by the commissioner of banks, it seems that the only purpose for obtaining consent was to assure compliance with the requirements of the statute, particularly where assets other than cash were to be taken at market value. Obviously, the market value of such assets might be different than book value.

West contends that this latter section should be controlling in this case, while respondent Signal claims that this case should have originally been brought before the Commerce Commission under the sections regulating the issuance of new bank charters. Minn. St. 45.07. The words of the statutes themselves indicate that West is correct. It is merely changing its location within the confines of a municipality for which it was granted a charter, not establishing a new bank nor changing its location to another

municipality. Furthermore, the original 1923 charter for West and a replacement charter in 1964 named the city of West St. Paul as the bank's place of business but did not include a street address. This was characteristic of all bank charters issued. The word "location" as used in Minn. St. 45.07 then had to mean the municipality rather than a specific street address because "existing bank or banks" referred to could not have been in the "locality" if that meant the same specific address. Thus, from a reading of the statute itself, bank charters were not limited to a specific street address but rather to localities such as municipalities.

The administrative history of the statutes and practices throws some light on the issues. During the administrative hearing of this case, the commissioner of banks took notice of the "longstanding practice of the Commissioner of Banks and his predecessors to hear applications under Minnesota Statutes, Section 47.10, by banks to relocate within the same municipal district in which they are chartered to do business" and that this practice has predated and continued after the 1955 and 1957 amendments to § 47.10. This administrative practice had its origin in two opinions of the attorney general issued in the early part of this century. In Report Attorney General, 1920, No. 8, it was stated that a bank may not change its place of business to another municipality by amending its certificate of incorporation. Rather, it had to follow the procedures for obtaining a new bank charter. In Opinion Attorney General, No. 29-A-22, Oct. 12, 1923, the attorney general stated that, in the case of a bank changing its place of business from one municipality to another, "[t]he same proceeding should be taken as in the case of an original application [for a new charter]." We should agree with this proposition because charters are granted for cities or other definite geographical areas, not specific street addresses. Thus, it became standard administrative practice for changes of location within the same municipality to be approved by the commissioner of banks and changes from one municipality to another

to be approved by the Commerce Commission.[1] In the case of Plunkett v. First Nat. Bank of Austin, 262 Minn. 231, 115 N. W. 2d 235 (1962), although the case was ultimately decided upon other grounds, this court did cite the Attorney General opinions discussed above and recognized the administrative practice that they had created.

Signal cites Opinion Attorney General, No. 53-F, Dec. 17, 1946, as authority for the position that the word "locality" has been substituted for the word "municipality" and argues that any change in "locality" by a bank must be treated like an application for a new charter. The 1946 opinion cited, however, deals with the construction of completely different statutes, and furthermore, there is no evidence that it in any way changed standard administrative practice.

The major thrust of Signal's argument in this case is that administrative practice in regard to changes in bank location is no longer sound. More specifically, Signal contends that changing location from one "trade area" to another within the same municipality is the equivalent of changing from one municipality to another and, therefore, should also be treated as an application for a new bank charter. Both the commissioner of banks and the Commerce Commission have rejected this argument, and we should do the same.

This court has treated time-honored administrative practices with a great deal of respect. Where an administrative agency has interpreted a statute and the legislature has subsequently revised the statute without modifying the interpretation, this

---

[1] The relocation of a bank from the municipality for which it was chartered to a location outside its charter involves other considerations. Despite the rather broad language in Minn. St. 47.10, it is obvious that a bank chartered, say in West St. Paul, could not move its place of business into North St. Paul solely under § 47.10, as it was not given a charter for that purpose under § 45.07 and in effect would need a new charter and the commission should require that all conditions of § 45.07 be met. Furthermore, past administrative practices support this conclusion.

court has said that the administrative construction must be taken to have been approved. See, 17B Dunnell, Dig. (3 ed.) § 8952. Applying this principle to the present case, the administrative practice of processing all changes of bank location within a municipality under § 47.10 has gained legislative approval. If the rule is to be changed so that "trade areas" may be taken into consideration, it should be done by the legislature and not this court. While it has been the standard administrative practice to allow objecting banks to appear before the commissioner to present evidence that the proposed move would adversely affect their solvency, there is nothing in the statutes or past administrative practices requiring an applicant desiring to change its location from one site to another within the municipality for which it has a charter to prove the existence of a reasonable public demand. Nor are there any rules or regulations of the commissioner of banks or of the commission that would support such a requirement. Yet, on an appeal, the commission added two new requirements—(1) that West prove the existence of a reasonable public demand and (2) that the burden of proving that the solvency of Signal would be not adversely affected is upon West. Not only are there no statutes or past administrative practices that would place such a burden on West, but the past administrative practice was to the contrary.

While broad language was used in Minn. St. 45.03 permitting the commission to review the commissioner's decision and to reverse it, that language cannot be construed as giving the commission the power to amend the statutes or create laws. Nor does it give to the commission the power on appeal to it from decisions of the commissioner of banks to adopt rules and regulations. If the commission has the power to adopt rules and regulations embodying any additional requirements above and beyond § 47.10, they would have to be adopted in accordance with the Administrative Procedures Act (APA).

There should be little if any question but that the commission

is one of the agencies governed by the APA. Minn. St. 15.01, 15.0411. See, Bryan v. Community State Bank, 285 Minn. 226, 172 N.W. 2d 771 (1969) ; In re Application of Jackson, 277 Minn. 293, 296, note 5, 152 N. W. 2d 472, 474 (1967). While the commission has authority to enact regulations with reference to the administration of the law, it does not have authority to determine what the law should be or to supply substantive provisions of law. See, Wallace v. Commissioner of Taxation, 289 Minn. 220, 184 N. W. 2d 588 (1971). Assuming arguendo that the commission had the power to adopt rules and regulations which would in effect insert into Minn. St. 47.10 requirements of a reasonable public demand and that the change in location not endanger the solvency of the Signal Hills State Bank or any other bank in the area, and that West have the burden of proof on both of those issues, how could the commission adopt such rules on an appeal without going through the explicit procedures of the APA? Under that act, an agency may promulgate reasonable substantive rules and regulations for the purpose of carrying out the duties and powers imposed upon and granted to it, but such action shall not exceed the power vested in the agency by statute. Prior to the adoption of any rule authorized by law, the agency must give notice of its intended action and afford interested persons an opportunity to submit data or views orally or in writing. No rule shall be adopted unless a public hearing is held following the giving of at least a 30-day notice. Among other requirements, a proposed rule before being adopted must be submitted to the attorney general as to form and legality and approved by him. Minn. St. 15.0412. There is no need to go into all procedures necessary to the adoption of rules by the commission. The foregoing should show that it was not intended that rules would be adopted for the first time on an appeal to the commission.

I would reverse the commission and uphold the decision of the commissioner of banks who found:

"11. That while evidence was presented by the objectors that their rate of growth might be slowed if the move is allowed, it

was not established that the move would affect the solvency of the Signal Hills State Bank.

"12. If the proposed change of location of the West St. Paul State Bank is allowed, its solvency will not be endangered."

and held as a matter of law that—

"* * * the change of location of the West St. Paul State Bank would not endanger the solvency of the Signal Hills State Bank nor any other existing bank in the area."

These findings are adequately supported in the evidence and while it appeared from finding 11 above that the burden of proof may have been placed on Signal, this obviously was done in accordance with past administrative practices.

While it might be argued that the solvency issue should not have been in the case at all, there is a sound basis for it in the past administrative practice—putting the burden of proof on the objecting bank was obviously a part of that practice and should be adhered to if solvency is an appropriate issue. Besides, why shouldn't the objecting bank have the burden of proving matters relating to its own affairs? Where the facts with regard to an issue lie peculiarly in the knowledge of a party, that party should have the burden of proving the issue. See, McCormick, Evidence (2 ed.) § 337, p. 787.

ROGOSHESKE, JUSTICE (dissenting).

While I agree that the Commerce Commission has broad statutory powers to reverse or modify the decision of the commissioner of banks, I join in the dissent and disposition urged by Mr. Justice Kelly.