In the Matter of the Application of Gayle LECY et al for Certificate Authorizing the Renville County State Bank of Renville to Transact Business in that name at the Intersection of S.E. 5th St. and U.S. Highway 212, in the City of Renville, County of Renville, State of Minnesota.

O'CONNOR BROTHERS STATE BANK OF RENVILLE et al, petitioners-objectors, Appellants,

v.

DEPARTMENT OF COMMERCE of the State of Minnesota, Respondent,

v.

Gayle LECY et al, applicants-intervenors, Respondents.

Nos. 50451, 51546.

Supreme Court of Minnesota.

April 24, 1981.

Peterson, Popovich, Knutson & Flynn and Robert Hughes, St. Paul, for appellants.

Warren Spannaus, Atty. Gen., Thomas Muck, Deputy Atty. Gen., Jacqueline Taylor, Sp. Asst., St. Paul, for respondent Dept. of Commerce.

Larkin, Hoffman, Daly & Lindgren and Gerald Friedell and Christopher Dietzen, Minneapolis, for respondents Gayle Lecy, et al.

TODD, Justice.

Gayle Lecy and others petitioned the Minnesota Department of Commerce for a charter to operate a state bank. A hearing was held before a referee who issued proposed findings of fact. On July 28, 1976, the Commerce Department issued its order directing the Commissioner of Banks to issue a certificate of authorization based on conditions as to capital structure, securement of federal deposit insurance, and conformance with reasonable regulations and conditions imposed by the Commissioner of Banks.

The objectors appealed this decision to the district court which sustained the order of the Commerce Department, but modified the trade area of the proposed bank. We affirm the trial court's approval of the order of the Commerce Department, but reverse the decision of the trial court modifying the trade area of the proposed bank.

On September 19, 1975, respondents filed an application for a bank charter with the Commerce Commission. Thereafter, commencing on December 16, 1975, and ending on February 13, 1976, a hearing was conducted on the application by Hearing Examiner George Beck. The issuance of the application was hotly contested by appellants, generating a transcript totaling close to 3,000 pages. The major focuses of the controversy at the hearing were the statutorily imposed criteria of "reasonable public demand for this bank" and whether "the probable volume of business in this location is sufficient to insure and maintain the solvency of the new bank and the solvency of the then existing bank or banks in the locality * * *." Minn.Stat. § 45.07 (1980). A subsidiary issue, but also hotly contested, was the proper trade area for the new bank.

At the hearing, each side presented expert testimony in support of its position. The applicants-respondents introduced an "Economic Feasibility Study." This study analyzed the Renville market area and contained a household survey. The study established the trade area for the new bank as consisting of an eight-township area including Erickson, Sacred Heart, Crooks, Emmet, Flora, Winfield, Troy, and Henryville townships. Within the trade area, the study found that 67 percent of those responding to the survey within the City of Renville said they would use the bank, 47 percent of those responding in Crooks, Emmet, Erickson, and Sacred Heart townships would use the bank, and 31 percent of those responding in the eastern tier of townships Winfield, Troy, and Henryville said they would use the bank. Of the total households surveyed, 69 percent of those responding indicated that there was a need for a second bank in Renville. The deposit potential aspect of applicants-respondents' study concluded that the new bank could expect $2,589,700 in deposit potential after the third year. This part of the study also projected that the maximum loss of deposits to O'Connor Brothers State Bank, located in Renville, would be $1.2 million in the first year. In December of 1974, the O'Connor Brothers Bank had total deposits of $7,447,000. Thus, the loss of a maximum of $1.2 million in deposits would not endanger

the solvency of the O'Connor Brothers Bank.

The objectors-appellants also introduced an economic feasibility study in support of their position. Appellants' study entitled, "Economic Assessment of Renville County Bank Market", tended to show that a new bank in Renville would not get any significant business from the eastern tier of townships Winfield, Troy, and Henryville. This conclusion was based on a study of the O'Connor Brothers Bank market area done by the objectors which showed that the existing bank in Renville did not get any significant business from the eastern townships. Objectors' expert testified that it was her opinion a new bank in Renville would have the same trade area as O'Connor Bank.

The appellants' study also concluded that the O'Connor Bank had a high market penetration in its trade area so that there were few untapped customers on which the new bank could draw. The study also found that the population in the trade area was relatively static, making it necessary for a new bank to gain deposits by "redistributing present customer dollars from the O'Connor State Bank, the Sacred Heart and Danube banks" and the Renville Farmer's Co-op. Credit Union. This loss of accounts, the study concluded, would cause "severe injury" to the O'Connor Bank. Finally, the study concluded that "[p]ublic need for a fourth bank has not been documented on the basis of short term population growth or local commercial/industrial expansion."

At the close of all evidence, Hearing Examiner Beck filed proposed findings of fact with the Commerce Commission on May 6, 1976. The hearing examiner's findings did not include conclusions of law or a decision to grant the charter because pre-1976 law did not authorize him to make a recommended decision. Act of June 4, 1975, ch. 380, § 16, 1975 Minn.Laws 1285, 1293. The findings contained all the statutorily imposed conditions precedent to the granting of the charter. Specifically, the hearing examiner found that the new bank's service area would consist of the eight-township area proposed by the applicants-respondents. The hearing examiner found that the new bank would face a loss in its first two years of operation, but would make a profit in its third year of operation. The maximum deposit loss to the O'Connor Bank caused by the new bank would be $1.2 million according to the examiner's findings.

On May 20, 1976, the attorney for the objectors-appellants wrote to the Commerce Commission, enclosing a "Request and Motion", and asked the Commission to consider the appellants' objections to the hearing examiner's proposed findings of fact. The secretary for the Commission responded on June 8, 1976, informing appellants' attorney that the commissioners thought "this was a very unusual procedure", but that the request was granted.

On June 17, 1976, the Commerce Commission met and resolved that "Proposed Conclusions of Law be prepared based on the Findings, and Proposed Decision to approve the Renville County State Bank application * * * " and that the parties be notified of the proposed decision and given the opportunity to make written and oral objections. Based on the later testimony of Commissioner Mampel, it seems clear that this was not a final decision. According to the Commission's secretary, the Commission was attempting to give the objectors the benefits of both the old and new law, since under the new law the hearing examiner would have made conclusions of law and a proposal for the Commission's action on the application. Subsequently, proposed conclusions of law were prepared. In line with the statutory requirements, the conclusions stated that the new bank would be solvent and that there was no danger to the solvency of existing banks. The conclusions also stated that there was reasonable public demand for the new bank.

On July 27, 1976, the Commerce Commission met to hear and consider the written and oral arguments of both sides. In the afternoon of July 27, two of the commissioners met and approved the application. The whole afternoon meeting lasted 18 min-

utes and two matters were discussed other than the bank application. According to the testimony of two of the objectors present at the afternoon meeting, there was no discussion between the Commissioners, and the approval of the application took approximately two minutes.

After the final decision of the Commerce Commission to grant respondent's application, appellants filed this action in the Ramsey County District Court seeking review of the Commission's decision pursuant to Minn.Stat. §§ 15.0424, 15.0425, 45.032 (1978). The petition alleged that both the Commission and the hearing examiner had committed numerous procedural and substantive errors in granting the application. Among the procedural errors alleged were that the Commission failed to decide the motions made by appellants; that the hearing examiner failed to follow statutorily required procedures by omitting conclusions of law and a proposed order from his report; and that the Commission failed to dispose of appellants' exceptions to the hearing examiner's report. The substantive errors alleged were that applicants did not establish a reasonable public demand for the new bank; that the trade area for the bank was inaccurate; that the population and economic statistics for the Renville area did not justify another bank; that the applicants failed to establish that the new bank would remain solvent and that existing banks would not be adversely affected; and that the commission failed to comply with the open meeting law.

The trial court bifurcated appellants' alleged errors into procedural and substantive errors. After a trial ending on May 11, 1978, the trial court entered its findings of fact, conclusions of law, and order for partial judgment on February 7, 1979. This first order rejected all of appellants' claimed procedural errors. On December 2, 1979, the trial court entered findings of fact, conclusions of law, and order for supplemental judgment. This order rejected all of appellants' claims for relief based upon substantive errors committed by the Commission, but concluded that the Commission had selected the incorrect trade area for the new bank. Appellants appealed from these orders.

The issues are:

1. Did the trial court err in modifying the trade area of the proposed bank?

2. Is the decision of the Commerce Commission to authorize a bank charter for the Renville County State Bank of Renville supported by substantial evidence in view of the entire record as submitted?

3. What is the proper scope of review of administrative decisions?

4. Were procedural errors committed by the Commerce Department in authorizing the bank charter?

1. This court has established the factors to be used by the Commission to determine whether the "reasonable public demand" criteria of Minn.Stat. § 45.07 (1980) has been satisfied. *In re Application of Jackson*, 277 Minn. 293, 152 N.W.2d 472 (1967). These factors are as follows:

(1) Number of banks already serving the area in which the proposed bank would locate; (2) size of area; (3) population of area; (4) wealth of residents of area; (5) commercial and industrial development of area; (6) potential growth of area; (7) adequacy of the services being provided by existing banks compared to the needs of residents and the services to be offered by proposed bank; (8) capability of existing banks to handle potential growth of the area; (9) convenience of the location of existing banks to residents of the area as compared to convenience of the proposed bank; (10) size of banks in area; (11) dates when the banks in the area were established; and (12) the number of persons in area who desire to use the proposed bank and the amount of business they would generate.

*Id.* at 295, 152 N.W.2d at 474, footnotes omitted. In a footnote the court stated that "[t]he relevant area is one determined primarily by economic considerations and is not necessarily a geographic or political unit." *Id.* at 295, n.3, 152 N.W.2d at 474, n.3. From these criteria, it is clear that the

relevant trade area must be defined before it is determined that the statutory criteria have been satisfied.

In *First National Bank of Shakopee v. Department of Commerce*, 310 Minn. 127, 133, 245 N.W.2d 861, 865 (1976), this court reiterated the scope of review in bank charter cases:

In reviewing the decisions of the Department of Commerce, this court has clearly stated the limits of its scope of review: It [the court] cannot disturb the commission's determination because it does not agree with it. It can only interfere when it appears that the commission has not kept within its jurisdiction, or has proceeded upon an erroneous theory of law, or unless its action is arbitrary and oppressive and unreasonable so that it represents its will and not its judgment, or is without evidence to support it. *State ex rel. Dybdal v. State Securities Commission*, 145 Minn. 221, 225, 176 N.W. 759, 761 (1920).

In addition, the court noted that arguments over the weight of the evidence and the credibility of expert witnesses "is a matter particularly within the province of the commission and its hearing examiner." *Id.* at 134, 245 N.W.2d at 865.

■ Applying this standard, it seems clear that the trial court erred in substituting its own opinion as to the trade area for that of the Commission. The trial court never stated the evidence upon which it relied to reach this conclusion. Respondents' economic study and expert witness set the trade area of the new bank as the Commission found it to be. Appellants' economic study and expert found that the trade area of the bank would be as the trial court found it to be. Neither expert's opinion was seriously impeached at the hearing. Therefore, the question of the credibility of the experts' testimony should have been left to the hearing examiner and the Commission.

We hold that the trial court erred in redefining the trade area of the proposed bank and reinstate the trade area established by the Commerce Commission.

■ 2. We have reviewed the entire transcript and exhibits submitted herein. The matter was bitterly contested. Both parties rely heavily on economic analysis reports and operation projections prepared by their respective experts. These reports were excellent, but, contrary to the claims of the objectors, we do not find any basis to give more credence to their experts' evidence as compared to the evidence presented by the applicants' experts. The record, considered as a whole, substantiates the decision of the Commerce Commission to accept the projections and proposals of the applicants' experts. The findings that the statutory criteria have been met by the applicants is affirmed.

■ 3. In deciding the above issues, we have relied on our cases establishing the narrow scope of review of the courts in considering decisions of the Commerce Commission. *Ellis v. Minneapolis Commission on Civil Rights*, 295 N.W.2d 523 (Minn. 1980); *First National Bank of Shakopee v. Department of Commerce*, 310 Minn. 127, 245 N.W.2d 861 (1976); *Gibson v. Civil Service Board*, 285 Minn. 123, 171 N.W.2d 712 (1969). Objectors argue that we should redefine our scope of review in accordance with the suggestions of Mr. Justice Kelly in his concurring opinion in *Ellis*. Even if we were inclined to do so, the results would not be different. Here, the findings are not clearly against the weight of the evidence, nor are we left with a definite and firm conviction that a mistake has been made.

4. The objectors challenged the procedural process of the Commerce Commission in reaching its decision. We agree with the trial court's determination that no procedural deficiencies occurred. The trial court found as fact that two of the commissioners had read the entire record before the hearing examiner and that the third had read one-half of the record. The trial court also found that "[e]ach Commissioner separately considered the record of the proceedings before the Hearing Examiner, and exceptions and supporting written argument filed, without deliberative discussion with

other Commissioners on those matters." As a conclusion of law the court stated: "[a]pplicable law does not require that the Commission deliberate collegially." In its memorandum, the trial court noted that the mental process rule and the Open Meeting Law result in the requirement that meetings be held in public, but deny the discovery of a decision-maker's mental process. Therefore, the court reasoned that the decision-maker may deliberate individually, taking official action at a public meeting.

The appellants do not challenge the trial court's findings that the commissioners considered the record before the hearing examiner and the written and oral objections submitted by appellants prior to making a final decision. The essence of appellants' claim, therefore, is that the commissioners should be required to hold a collegial discussion on each of their objections or to discuss those objections in a written memorandum.

■ As pointed out by the respondent Commerce Commission, nothing in the statutory requirements applicable to the Commission requires a collegial discussion between the commissioners prior to a final decision. A fair reading of Minn.Stat. § 45.04, subd. 2 (1980), seems to be that the Commission is vested with the power to decide to grant an application for a new bank charter. Nowhere in the statute is it required that the commissioners discuss the merits of the application before a decision is made. Since the district court found that two of the three commissioners had read the record and considered appellants' objections, it seems fair to infer that both favored granting the application. To require the commissioners to orally discuss in public a decision on which they have reached an independent judgment just for the sake of form is absurd.

The conclusion that collegial discussion should not be required of the Commission is bolstered by this court's decision in *Suburban National Bank v. Department of Commerce*, 260 N.W.2d 291 (Minn.1977.) In the *Suburban National* case, the court stated:

Suburban National does not question the fairness or completeness of the commission's extensive hearings on this matter or the reasonableness of its findings of fact. Suburban National's first two arguments focus on the commission's conclusions of law, which are phrased in the general terms of the criteria articulated in § 45.07. By narrowly focusing on portions of the conclusions of law, Suburban National argues it is uncertain whether the commission actually applied the statutory criteria to the specific facts of this case. We find no merit in these arguments. The record of the hearing and the commission's decision—consisting of findings of fact, conclusions of law, and an order—clearly show that the commission properly considered and based its decision on the statutory criteria. At most, Suburban National has only pointed to technical imperfections in the commission's expression of its conclusions of law.

Suburban National's third argument is that the commission failed to give adequate reasons for its conclusion that the probable volume of business would support both Suburban National and Prairie State and that this failure violates Minn.St. 15.0422, and the standards of *In re Application of Jackson*, 277 Minn. 293, 295, 152 N.W.2d 472, 474 (1967), and *Bryan v. Community State Bank*, 285 Minn. 226, 231, 172 N.W.2d 771, 775 (1969). We reject this argument. The commission's findings of fact are a detailed determination of the facts relevant under the statute.

*Id.* at 292 (footnote omitted). Because the court in *Suburban National* found the Commission's written findings of fact and conclusions of law to be sufficient to determine that the Commission considered and complied with the statutory requirements, it would be inconsistent to require the Commission to hold collegial discussions in this case.

We express deep concern over the inordinate length of time this matter has been in the court system. Some of this delay seems occasioned by an inappropriate application of the rule adopted by this court in *Mampel v. Eastern Heights State Bank of St. Paul,*

254 N.W.2d 375 (Minn.1977). We there stated:

Discovery of the mental processes by which an administrative decision is made generally is not proper. *United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). This is not to say that discovery is absolutely prohibited in proceedings for judicial review of agency decisions. Discovery may be permitted by the district court upon procedural matters if the discovery is appropriately limited. Persons seeking review may make inquiry through discovery to determine whether the agency adhered to statutorily defined procedures or the rules and regulations promulgated by the agency itself which enter into the fundamental decision-making process. Included in this case would be limited and narrow inquiry into whether there was compliance with Minn.St.1974, § 15.0421, and whether any materials, communications or other information outside the record were relied upon in reaching the commission's decision.

*Id.* at 378.

The discovery procedures in this case went far beyond what was intended by the *Mampel* case to the point of subpoenaeing the commissioners before the trial court to render testimony. In order to preclude such procedures in the future, the following limitations are imposed upon the doctrine of discovery enunciated in *Mampel*:

■ Following a decision of the Commerce Commission, written interrogatories may be submitted by an appellant within 30 days of the date of appeal directed to each commissioner. Such interrogatories shall be limited to the following questions: (1) Did the commissioner adhere to all statutory and administrative procedural rules in reaching his decision? (2) If the answer to question one is no, what deviations took place? (3) Did the commissioner read the entire record prior to rendering a decision? (4) Did the commissioner rely on information outside of the record in making the decision? and (5) If the answer to question four is yes, what information outside of the record was relied upon in making the decision? The commissioners shall not be deposed, nor shall they be required to testify before the trial court reviewing their decision.

Further, absent newly discovered evidence, we see no reason for any further proceedings before the trial court unless the judge hearing the case desires oral argument as to issues involved. Since the transcript is already available, the trial court should make every effort to expedite the hearing and decision and should be extremely cautious in granting a delay in the proceedings. If these procedures are adhered to, we perceive no reason for reoccurence of the delays which have occurred in this case.

Affirmed in part; reversed in part; remanded to the district court for further proceedings consistent with this opinion.