ARVIG TELEPHONE COMPANY,
Respondent,
v.
NORTHWESTERN BELL TELEPHONE
COMPANY, Appellant,

and

Minnesota Public Service Commission,
Respondent.

Nos. 47999, 48136.

Supreme Court of Minnesota.

Aug. 18, 1978.

Rehearing Denied Oct. 11, 1978.

Garfield E. Lovaas, Minneapolis, Maun, Hazel, Green, Gayes, Simon & Aretz and James A. Gallagher, St. Paul, for appellant.

Wiese & Cox, Minneapolis, for respondent Arvig Telephone Co.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., Jerome L. Getz, Asst. Atty. Gen., Minnesota Public Service Commission, St. Paul, for Minn. Pub. Service Comm.

Heard before KELLY, SCOTT, and WAHL, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal by Northwestern Bell Telephone Company (Bell) from a decision of the district court reversing an order of the Public Service Commission. The Arvig Telephone Company (Arvig) sought and was denied approval from the Public Service Commission to proceed with the installation of certain new equipment which would provide services currently being performed by Bell. On appeal to the district court, the commission's order was reversed. We hereby reverse the decision of the district court with instructions to reinstate the commission's ruling.

The main office of the Arvig Telephone Company is located in Pine River, Minnesota, and currently provides local exchange telephone service to the north-central Minnesota communities of Pine River, Pequot Lakes, Backus, Hackensack, Woman Lake, Ideal Corners, and Breezy Point. Arvig also provides "toll" or long distance service for calls between these local exchanges. However, long distance calls originating in an Arvig exchange and destined for points outside the Arvig system must be routed into the Bell nationwide "intertoll" system.

At present, physical connections between the Bell and Arvig systems are located at Backus, Hackensack, Pequot Lakes, and Pine River. From these points, outgoing Arvig calls are routed through the Bell facility at Brainerd. There the calls are automatically identified to the calling number, timed, and "ticketed." [1] These functions are accomplished by Bell's CAMA–LAMA equipment (centralized automatic

message accounting, and local automatic message accounting). The CAMA–LAMA data is recorded on magnetic tape and is ultimately used by Bell to compile long distance billing information for Arvig.

In 1973, an engineering study conducted at Arvig's behest indicated that Arvig would benefit by purchasing and installing its own CAMA–LAMA equipment to time and "ticket" long distance calls entering the Bell network from Arvig exchanges. In order for Arvig to ticket all of its customers' calls, however, it would be necessary to reroute all outgoing Arvig calls through the Arvig central office where the CAMA–LAMA equipment would be located. This rerouting would in turn require the rearrangement of some circuitry at Bell's Brainerd office. [2] Under the new proposal, Arvig calls would enter the Bell system from only one point—Arvig's Pine River central office—rather than from the four locations previously described. The new single point of entry would require either that Arvig construct a new toll line between Pine River and Brainerd or that space be leased to Arvig on an existing toll line owned by Bell.

In accordance with the recommendations of the engineering study, Arvig proceeded to install a sophisticated new central switchboard which was equipped to accommodate the proposed CAMA–LAMA equipment. On September 6, 1974, Arvig notified Bell of its intention to have its new CAMA–LAMA equipment operational by November 1, 1975. In his letter to Bell, Arvig's president also requested that Bell prepare the necessary circuitry alterations at its Brainerd office. Bell objected to the proposed alterations and declined to comply with Arvig's request. Unable to gain Bell's cooperation, Arvig initiated an action before the Minnesota Public Service Commission to compel Bell to allow the requested change in circuitry connections. Hearings were held before Commissioner Ronald L. Anderson in May of 1975. The commis-

---

1. "Ticketing" is the process of electronically recording the necessary billing information for each long distance call.

2. Other equipment removal and substitution would also be necessary, but the parties are in dispute over the extent and duration of any resulting duplication of equipment.

sion's proposal for decision was thereafter filed. Arvig's exceptions to the proposed decision were argued before all five members of the commission in January 1976. On April 8, 1976, the commission issued its final order rejecting Arvig's request. Among the commission's conclusions were the following:

" * * * * *

"6. The Commission concludes that public convenience requires the continuation of the present connection of Arvig's exchange equipment with Northwestern's toll facilities and equipment within the meaning of Minnesota Statutes Section 237.12. Therefore, it is not necessary for the Commission to address the question of whether the connection, if made, would cause irreparable harm to Northwestern's system within the meaning of Minnesota Statutes Section 237.12.

"7. The Commission concludes that the construction and installation of the facilities and equipment proposed by Arvig for the purpose of providing and replacing toll telephone service and facilities provided by Northwestern would neither serve the public convenience nor benefit the public within the meaning of Minnesota Statutes Section 237.16, subdivision 1."

Arvig appealed the commission ruling to the district court of Cass County. That court based its review on the record and exhibits from the proceedings before the commission, and on the parties' memoranda and oral argument. On June 6, 1977, judgment was entered in favor of Arvig, reversing the commission and requiring that the proposed change in connections be allowed. From the district court judgment, Bell appeals to this court.

**3.** Minn.St. 237.12 reads in part as follows: "Wherever a physical connection or connections exist between any telephone exchange system operated by a telephone company and the toll line or lines operated by another telephone company or between its toll line or lines and the telephone exchange system of another telephone company, or between its toll line and the toll line of another telephone company, neither of the companies shall cause such connection to be severed or the service between the companies to be discontinued without first

Two issues have been raised by the parties for our determination:

(1) What is the application of Minn.St. 237.12 and 237.16 to this dispute?

(2) Does public convenience require that Arvig's request be granted?

■ 1. The basic issue in this case involves the proper interpretation and application of Minn.St. 237.12 and 237.16. We note that on matters of statutory interpretation, this court is not bound by the determination of an administrative agency. The manner in which the agency has construed a statute may be entitled to some weight, however, where (1) the statutory language is technical in nature, and (2) the agency's interpretation is one of long-standing application. See, *Minnesota Microwave, Inc. v. Public Service Comm'n*, 291 Minn. 241, 190 N.W.2d 661 (1971). As will appear below, the language of the statutes at issue herein is not especially technical and has not been the subject of a consistent, well-established agency interpretation.

On its face, Minn.St. 237.12 purports to control connections and disconnections between neighboring telephone companies, and it is not disputed that the Arvig proposal would require the severance of some existing connections with Bell and the alteration of the present connection between Pine River and Brainerd. In brief, § 237.12 requires that connections between telephone companies be made when public convenience will be served thereby, and that disconnections may not be made unless public convenience so requires.[3] The power to order connections and disconnections is vested by the statute in the Public Service

obtaining an order from the department upon an application for permission to discontinue such physical connection. Upon the filing of an application of discontinuance of such a connection, the department shall investigate and ascertain whether public convenience requires the continuance of such physical connection, and if the department so finds, shall fix the compensation, terms and conditions of the continuance of the physical connection and service between the telephone companies."

Commission. From the outset of this litigation, the parties have been in direct conflict on the extent to which Arvig's proposal would further public convenience, if at all.

The second focal point of the parties' disagreement is Minn.St. 237.16, subd. 1. That section provides in part that no company may install toll call equipment in a locality where another company is already furnishing toll telephone service.[4] Each party has argued that it alone provides toll service to Arvig customers within the meaning of § 237.16, subd. 1. In addition, Arvig contends that even if Bell is found to be the sole supplier of toll call service, the proposed CAMA–LAMA equipment is not "equipment * * * installed for the purpose of furnishing * * * toll telephone service * * *," and is therefore not prohibited by the statute.

We have carefully reviewed the statutes and the parties' respective contentions, and find neither of their positions to be entirely persuasive. In fairness to the litigants, it must be observed that at the heart of the difficulty posed by this case is the somewhat antiquated nature of the statutes with which we must deal. It seems plain to us that much of the language in the existing statutes is descended directly from a time when the structure of the telephone industry in Minnesota was vastly different from its present state. As a consequence, the dispute we are asked to resolve appears to fall beyond the express contemplation of either of the provisions to which the parties have devoted their arguments.

■ Considering § 237.12 first, we observe that it was initially enacted in 1915. The legislature's interest at that time was plain—it sought to ensure that the existence of numerous small, independent telephone companies would not hamper the flow of communications between the customers of different companies.[5] The statute accomplishes its purposes by virtually requiring that any requested connection be allowed, and making it difficult to effect any disconnection thereafter. Accordingly, we conclude that the statute must be construed to affect only those connections and disconnections which would substantially alter the flow of communications between neighboring telephone systems.

In this case it is clear that Arvig's proposal does not threaten the evil which the statute was intended to eliminate. That is, Arvig does not propose to sever all or a substantial portion of its connections with Bell and thereby impair its customers' ability to communicate with Bell's customers. Rather, Arvig desires to change the configuration of existing connections with the Bell network. Under the construction set forth above, therefore, section 237.12 is not squarely applicable to this case.

■ Similarly, we think Minn.St. 237.16, subd. 1, cannot be held to directly control the parties' dispute. A fair reading of this section indicates that its application is limited to those situations in which one telephone company invades the territory of another and attempts to provide toll service where the existing company had previously been the sole provider of such service. But the statute fails to make provision for territories in which more than one company provides toll service, and we think that such is the state of affairs in the present case. In our view, both Arvig and Bell must be deemed to provide toll service to Arvig customers. Arvig handles toll calls between

4. The pertinent part of Minn.St. 237.16, subd. 1, states: "* * * No lines or equipment shall be constructed or installed for the purpose of furnishing local rural or toll telephone service to the inhabitants or telephone users in any locality in this state, where there is then in operation in the locality or territory affected thereby another telephone company already furnishing such service, without first securing from the department a declaration, after a public hearing, that public convenience requires such proposed telephone lines or equipment; * * *"

5. In *Tri-State Telephone & Telegraph Co. v. Intercounty Telephone Co.,* 211 Minn. 496, 505, 1 N.W.2d 853, 859 (1942), we observed: "The statute is a regulatory measure designed to secure the continuous transmission of telephonic messages by compelling telephone companies to physically connect their lines where the public convenience requires."

the communities within its territory, and Bell takes over all toll service on calls bound for points outside the Arvig territory. Arvig customers thus receive toll services from both companies.[6]

■ The fact that we find neither § 237.12 nor § 237.16 to be exclusively controlling does not mean, however, that we are without guidance in resolving the parties' dispute. For although the language of the respective statutes is outmoded, it nonetheless points the way to a solution consistent with past and present goals of public utility regulation. In the broadest sense, § 237.12 seeks to ensure continuity and uniformity of telephone service for all Minnesota customers. It does so by focusing on physical connections and disconnections between independent telephone companies. Section 237.16, on the other hand, functions essentially as an antiduplication statute. Its purpose is to eliminate costly, inefficient duplication of ·equipment. Under either statute, a telephone company desiring to take action which could conflict with the purpose of the statute must first persuade the Public Service Commission that the proposed action would further the public convenience. In either case, the commission has been made the guardian of the public interest in continuity of service and nonduplication of facilities. The controversy between Arvig and Bell could arguably be viewed as either a connection-disconnection case or an equipment duplication case. Regardless of the characterization, however, Arvig's proposal would require commission approval in the form of a finding of public convenience. We conclude, therefore, that it was perfectly proper for the commission to proceed as it did, evaluating the public convenience component of Arvig's proposal in light of the purposes of both § 237.12 and § 237.16. Since the statutes fairly indicate that the legislature intended the commission to rule on such questions, we find it unnecessary to restrict the commission to

one provision or the other on the facts of this case. We note, however, that the confusion generated by this litigation seems easily capable of repetition and would best be remedied by a legislative amendment.

■ 2. Having determined that Arvig's proposal required a finding of public convenience, we turn to the ruling entered by the commission in this case. In delineating the scope of our review of administrative agency decisions, we have in the past drawn a distinction between legislative and quasi-judicial agency functions. Agency determinations which are legislative in character receive an extremely limited review on appeal, while quasi-judicial actions are somewhat more closely scrutinized. The twin standard was most recently reiterated in *St. Paul Area Chamber of Commerce v. Minn. Public Service Comm.*, Minn., 251 N.W.2d 350, 358 (1977), as follows:

"(a) When the Public Service Commission acts in a judicial capacity as a factfinder, receives evidence in order to make factual conclusions, and weighs that evidence as would a judge in a court trial, it will be held on review to the substantial-evidence standard.

"(b) When the Public Service Commission acts in a legislative capacity as in rate increase allocations, balancing both cost and noncost factors and making choices among public policy alternatives, *its decisions will be upheld unless shown to be in excess of statutory authority or resulting in unjust, unreasonable, or discriminatory rates by clear and convincing evidence.*" (Italics supplied.)

■ We have also held that when the Public Service Commission (or its predecessor, the Railroad and Warehouse Commission) considers a question of public convenience, it acts in a *legislative* capacity. In *Dahlen Transport, Inc. v. Hahne*, 261· Minn. 218, 225, 112 N.W.2d 630, 635 (1961), we said: ·

---

**6.** Both §§ 237.12 and 237.16 are discussed in our decision in *Tri-State Telephone & Telegraph Co. v. Intercounty Telephone Co., supra.* Although that case is distinguishable on its facts and was decided primarily on constitu-

tional grounds, the opinion contains dicta inconsistent with our present perception of §§ 237.12 and 237.16. Therefore, to the extent inconsistent with the views expressed herein, the *Tri-State* opinion is disapproved.

"* * * Determination of convenience and necessity, *like determination of rates, is a legislative matter.* In determining the extent to which competition should be permitted, as well as the extent to which it should be limited, the commission has been legislatively granted a rather wide discretion, and it is only when it proceeds in a manner which is not legally permissible that the courts may interfere with the exercise of that discretion." (Italics supplied.)

See, also, *Rock Island Motor Transit Co. v. Murphy Motor Freight Lines, Inc.,* 239 Minn. 284, 288, 58 N.W.2d 723, 727 (1953). Thus, when the Public Service Commission rules on the question of public convenience, its decision may be overturned only if demonstrated to be unjust or unlawful by clear and convincing evidence.

The district court below, however, erroneously held that the commission had in this case ruled in a quasi-judicial capacity, and proceeded to subject the commission's findings to an in-depth review. Indeed, even if the district court had correctly held that the action before the commission was quasi-judicial, the review it conducted on appeal far exceeded the allowable bounds under Minn.St. 15.0425.[7] In any event, we are not bound by the district court's decision. With respect to the commission's ruling the district court sat strictly as an appellate tribunal. Since it exercised no secondary factfinding function, the district court's decision may be treated as advisory only, and this court may conduct an independent appellate review of the agency record. See, *Reserve Mining Co. v. Herbst,* Minn., 256 N.W.2d 808, 824 (1977).

As noted above, the commission found that Arvig's proposed new equipment and circuitry would not further public convenience. This conclusion was based on testimony and other evidence which indicated that Arvig's proposal would result in increased costs for Minnesota telephone customers without any meaningful improvement in service. We have carefully reviewed the transcript of the hearings before the commission and conclude that under the scope of review set forth above, Arvig has not borne its burden of proving the commission's ruling unjust or unlawful by clear and convincing evidence. We hold, therefore, that the district court erred in reversing the decision of the commission, and we affirm the commission's ruling.

In light of the foregoing, it is unnecessary for us to consider whether acceptance of Arvig's proposal would have operated to deprive Bell of property without due process of law.

The judgment of the district court is reversed with instructions to reinstate the ruling of the Public Service Commission.

Reversed with instructions.

TODD, J., took no part in the consideration or decision of this case.

---

7. The district court went so far as to substitute its judgment for that of the commission on the credibility of certain Bell witnesses.