In the Matter of the Application of Merle P. LARSON, President, and Kenneth A. Leyk, Executive Vice President and Cashier, State Bank of Grey Eagle to Amend the Certificate of Incorporation of said State Bank of Grey Eagle, Changing its Place of Business from the City of Grey Eagle to Frontage Road and Highway 71 South, in the City of Long Prairie, County of Todd, State of Minnesota.

FIRST NATIONAL BANK OF LONG PRAIRIE, etc., et al., petitioners-objectors, Appellants,

v.

DEPARTMENT OF COMMERCE, et al., Respondents,

State Bank of Grey Eagle, Intervening Respondent Below.

No. C4–83–839.

Supreme Court of Minnesota.

June 15, 1984.

Richard H. Kyle, St. Paul, for 1st Nat'l Bank of Long Prairie and 1st State Bank of Swanville.

Jon J. Hoganson, St. Paul, for Lee State Bank of Browerville.

Christopher J. Dietzen, Andrew Mitchell, Minneapolis, for 1st Nat'l Bank of Long Prairie and 1st State Bank of Swanville.

Thomas F. Pursell, St. Paul, for Res. Commerce Commission et al.

Steven J. Johnson, Minneapolis, for State Bank of Grey Eagle.

YETKA, Justice.

This appeal presents a question under Minn.Stat. § 47.52 (1982), the "home office protection rule" of Minnesota's detached banking facilities law. The home office protection rule prohibits establishment of a branch bank in a community of under 10,-000 unless all banks with main offices in the community have provided their written consent.

In this case, the State Bank of Grey Eagle seeks relocation of its main office from Grey Eagle to Long Prairie, a community of under 10,000, and retention of its Grey Eagle facility as a branch. Appellant First National Bank of Long Prairie is the only bank in Long Prairie. First National contends that the relocated Grey Eagle Bank will ʼactually operate as a branch rather than as a main office, making Grey Eagle's proposal a subterfuge for branch banking in Long Prairie without First National's consent.

This litigation began when the State Bank of Grey Eagle filed simultaneous applications with the Commerce Commission seeking authority to (1) relocate its main office from Grey Eagle to Long Prairie, (2) change its name to the Todd County State Bank, and (3) retain its present facility in Grey Eagle as a branch. Appellant First National Bank of Long Prairie and two intervenors filed a motion to dismiss the applications as violative of the home office protection rule. The motion was denied, and the Commerce Commission held a hearing to consider the relocation application.

Although a hearing examiner was satisfied that Long Prairie could support the relocation, he recommended against approval because of his conclusion that the three applications taken together were a

subterfuge for illegal branch banking in Long Prairie. The Commerce Commission accepted the hearing examiner's findings supporting the relocation, but rejected his conclusion of illegality and approved all three applications. The Ramsey County District Court affirmed on petition for review. We affirm the district court.

Since appellants do not seek review of the evidence supporting the commission's factual findings, we deem those findings correct and so restrict the following statement of facts to the commission's findings.

Long Prairie and Grey Eagle differ significantly in their potential for economic growth. Long Prairie is the seat of Todd County. The 1980 census tabulated the city's population at 2,589, an 18% increase over the previous decade. The town supports four major employers who employ 100 or more persons in the Long Prairie area. Highway 71, the major thoroughfare of Todd County, runs through Long Prairie. In contrast, Grey Eagle is a smaller and less economically prosperous town with a population of approximately 400.

The difference in economic opportunity is reflected in the size and growth rates of the Long Prairie and Grey Eagle banks. Both towns have only one bank—the First National Bank of Long Prairie and the State Bank of Grey Eagle. First National is a full-service bank with deposits of over $42,000,000 and assets exceeding $46,000,-000. Over 80% of Long Prairie residents bank at First National. Total deposits have increased approximately $11,000,000 from 1977 through 1981. The bank has been profitable in each of those years. The Grey Eagle Bank showed a deposit growth of $2,000,000 from 1977 through 1981 and also operated profitably. Ninety-five percent of the Grey Eagle bank's deposit base comes from the City of Grey Eagle.

After the commission's approval of its applications, the Grey Eagle bank began construction of a temporary facility in Long Prairie on Highway 71. That facility is now complete and in operation. The temporary office is intended to house banking operations for 2 years only; at the end of the second year, a permanent structure will be built on the site.

The current office occupies 1,000 square feet and contains a customer lobby, three teller windows, and two offices. It has air-conditioning, burglar protection, and drive-up services. No safety deposit boxes are planned. It will be initially staffed by three teller/clerks, a loan officer and the managing officer. The managing officer previously held that position with the Grey Eagle bank and will be responsible for management of both the Grey Eagle and Long Prairie facilities until a managing officer for the relocated main bank can be found. The permanent structure is intended to be much larger than the current facility, occupying approximately 4,000 square feet and including five or six teller windows, three drive-up stations, and safety deposit boxes.

The Grey Eagle bank projects deposits in its new Long Prairie location of $1,500,000 after 1 year of operation; $2,750,000 after 2 years; and $4,000,000 after 3 years. The record does not indicate how many area residents will be inclined to use the new facility. The Grey Eagle bank also projects that the combined operation of the Long Prairie and Grey Eagle facilities will earn $68,000 during the first year; $103,-000 the second year; and $42,000 the third year. However, when viewed separately, the Long Prairie location will not be profitable during those years, showing losses of $59,000; $32,000; and $102,000 respectively. The large loss projected for the third year of operations comes from the anticipated cost of building a permanent facility.

There is no intent to transfer any accounts from Grey Eagle to Long Prairie. The move was not prompted by an adverse economic climate in Grey Eagle, but by the greater economic opportunity available in Long Prairie. The community of Grey Eagle would maintain the profitability of the Grey Eagle bank if the moves were not to occur.

This move was not seriously considered until 1980 when Minnesota law was changed to give detached facilities authori-

ty to perform all the banking services of a main office. The Grey Eagle bank's president never applied for a detached facility in Long Prairie because he was sure that the First National Bank would not give its consent. The Grey Eagle bank will not go through with the proposed changes if the application for a branch in Grey Eagle is not approved.

In our view, two issues are presented by this appeal:

1. Whether Minnesota law prohibits approval of simultaneous relocation and detached facilities applications; and

2. Whether we may sustain the commission's conclusion that this is a *bona fide* relocation and not a subterfuge for illegal branch banking.

Both parties cite cases from other jurisdictions involving simultaneous relocation and branch applications. We do not think those cases are applicable to what we view as an interpretation of our own statutes.

1. Minnesota statutes provide three methods by which banks may enter new markets. The most difficult is through the establishment of a new bank, which requires a substantial capital outlay. *See* Minn.Stat. § 48.02 (1982). The criteria for establishing a new bank are detailed in Minn.Stat. § 45.07 (Supp.1983):

> If (1) the applicants are of good moral character and financial integrity, (2) there is a reasonable public demand for this bank in this location, (3) the organization expenses being paid by the subscribing shareholders do not exceed the necessary legal expenses incurred in drawing incorporation papers and the publication and the recording thereof, as required by law, (4) the probable volume of business in this location is sufficient to insure and maintain the solvency of the new bank and the solvency of the then existing bank or banks in the locality without endangering the safety of any bank in the locality as a place of deposit of public and private money, and (5) the

commissioner of commerce is satisfied that the proposed bank will be properly and safely managed, the application must be granted; otherwise it must be denied. In case of the denial of the application, the commissioner of commerce shall specify the grounds for the denial. A person aggrieved, may obtain judicial review of the determination in accordance with chapter 14.

A second way to enter a new banking market is by relocating an existing bank. The relocation requirements at the time of Grey Eagle's filing were contained in Minn. Stat. § 47.10 (1980), as interpreted by this court in *West St. Paul State Bank v. Signal Hills State Bank*, 302 Minn. 124, 223 N.W.2d 793 (1974). In *Signal Hills*, we indicated that the same criteria used in the consideration of new bank charters should be used to consider relocation applications.[1] However, we also noted that some of these criteria, such as the moral character and financial integrity of the applicants, may have been established at the time of the original application for a bank charter. Similarly, a relocation does not entail "organization expenses" as such.

The final method of penetrating a new market is through the establishment of a detached facility. Minn.Stat. § 47.52 (1982) prohibits detached facilities in communities of 10,000 or less unless all banks with main offices in the community have provided their written consent. This statute gives home offices an absolute veto; if a bank withholds its consent, there is no opportunity for hearing or any review by the commission.

█ In this case, the State Bank of Grey Eagle chose relocation of its main office as a means of entering the Long Prairie banking market. First National contends that this relocation is tainted by the simultaneous application for a branch bank to the existing Grey Eagle facility. We find nothing in Minnesota's banking statutes prohib-

---

**1.** The statute was amended in 1982 to codify the *Signal Hills* decision. *See* Minn.Stat. § 47.101 (1982).

iting approval of simultaneous relocation and detached facilities applications. In fact, the commission has approved three similar combined applications since passage of the 1980 amendment permitting branch banks to perform all the functions of the main office. The legislature has not indicated any disapproval of this administration of the banking laws. Furthermore, we think it makes little sense to require a bank to close its existing facility and relocate and then petition again to establish a branch office in the city of its initial location. Therefore, the commission was justified in simultaneously considering both the petition to relocate and the petition to operate a detached facility.

First National argued below that the following emphasized language of Minn.Stat. § 47.101, subd. 1 (1982) requires a relocating bank to close its existing place of business completely before operating elsewhere: "A bank, trust company, savings bank, or building and loan association may change its location, *dispose of its place of business*, and acquire another upon the written approval of the commissioner of banks or otherwise as provided for in this section." (Emphasis added.) We agree with the hearing examiner that this reading of the statute is far too narrow. The underlined language does not mandate relinquishment of the Grey Eagle bank. It merely states the logical consequence of granting authority to operate in a new location—the termination of authority to operate in the old location. The applicant may regain authority to use the original location through the separate review and approval of the detached facility application. That second step has been accomplished here. Thus, the continued operation of the original facility as a branch does not invalidate relocation of the main facility to Long Prairie.

First National states that it does not object to having another bank in Long Prairie, but only to the method by which the Grey Eagle bank seeks to establish itself there. First National would have the Grey Eagle bank relocate and close down its existing office or close down altogether

and obtain a new bank charter to operate in Long Prairie.

We do not see any sense in forcing Grey Eagle to choose either of these options. If it were to relocate and close down its existing office, the community of Grey Eagle would be left without a bank which appears to be used extensively by community residents. First National itself admits that the purpose of the home office protection rule is to keep banks in small communities for the convenience of the residents. In addition, closure of the Grey Eagle facility would jeopardize the financial stability of the relocated bank, a result also contrary to the purpose of the banking laws.

Similarly, we do not see why the Grey Eagle bank should have to establish an entirely new charter. At oral argument, First National's counsel stated that it would not object to a new charter application because of the large capitalization requirements. Except for capitalization, the standards for a relocation are essentially the same as those for a new charter. That being the case, it makes no sense that an existing bank be denied the right to relocate and to compete with existing banks and instead be forced to establish a new financial institution with a minimum financial structure to compete against an existing facility with $46,000,000 in assets. It appears to us that the only benefit of such a requirement would be to the existing financial institutions in making it easier for them to prevent new ventures in the community.

2. We now consider whether Grey Eagle's proposal is a subterfuge for illegal branch banking in Long Prairie. We agree with the commissioner's conclusion that it is not.

In its brief, Long Prairie characterizes the facts to make the move to Long Prairie seem to be the opening of a branch. Long Prairie notes that the Grey Eagle bank will not move its deposits; that, for the foreseeable future, the Grey Eagle facility will continue to do the larger volume of business; that the Long Prairie facility would not be profitable on its own; and that this move was not considered until the banking

laws were amended to allow branch banks to perform all the functions of a main office because Grey Eagle knew it could not obtain First National's consent for a detached facility in Long Prairie.

However, the commission viewed the facts in a light supporting the good faith of Grey Eagle's intent to relocate, and we cannot say this view is arbitrary, capricious, or unreasonable. The Long Prairie facility may presently be the smaller and less profitable of the two Grey Eagle bank offices, but the facts indicate that this is intended to be a temporary state. Apparently, the commission believed the testimony of Grey Eagle's president concerning future plans for a large, permanent facility at Long Prairie and expansion and growth of that office. Certainly, the greater potential for economic growth in Long Prairie bears out the intent to make that facility the home office. If an administrative agency properly carries out its function of reasoned decisionmaking, a reviewing court "should exercise restraint and affirm, even if it might have reached a different conclusion had it been the factfinder or policymaker." *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (1977). We accept the commission's view that a *bona fide* relocation is intended.

The trial court is therefore affirmed in all respects.