**In the Matter of the Petition of NEW ULM TELECOM, INC., f.k.a. New Ulm Rural Telephone Company, Minnesota Valley Telephone Company, Winthrop Telephone Company, Clements Telephone Company, and Redwood County Telephone Company for a Certificate of Public Convenience and Necessity to Provide and Operate a Telephone System between and in the Vicinity of St. George, Franklin, Redwood County, Winthrop, and New Ulm, Minnesota.**

**In the Matter of the Petition of SLEEPY EYE TELEPHONE COMPANY for Approval of Microwave Facility.**

No. CO–86–1100.

Court of Appeals of Minnesota.

Jan. 13, 1987.

James R. Olson, Berens, Rodenberg, O'Connor, Olson, Hinnenthal & Tuttle, New Ulm, for Relator New Ulm Telecom.

John B. Van de North, Jr., Briggs and Morgan, St. Paul, for respondent AT & T Communications of Midwest.

Steven D. Emmings, Carey & Emmings, Ltd., Fairfax, for Relators Redwood Coun-ty Telephone; Winthrop Telephone; Minnesota Valley Telephone and Clements Telephone.

Hubert H. Humphrey, III, Atty. Gen., Dennis D. Ahlers, Sp. Asst. Atty. Gen., St. Paul, for Residential Utilities Division.

Hubert H. Humphrey, III, Atty. Gen., Ann M. Seha, Sp. Asst. Atty. Gen., St. Paul, for Dept. of Public Services.

Richard J. Johnson, Moss & Barnett, Minneapolis, for Relator Sleepy Eye Telephone.

James A. Gallagher, Seth M. Colton, Maun, Green, Hayes, Simon, Johanneson and Brehl, St. Paul, Stephen T. Refsell, Minneapolis, for respondent Northwestern Bell.

Hubert H. Humphrey, III, Atty. Gen., Karl W. Sonneman, Sp. Asst. Atty. Gen., St. Paul, for respondent Minnesota Public Utilities Comm.

Heard, considered and decided by FOLEY, P.J., and SEDGWICK and FORSBERG, JJ.

## OPINION

FOLEY, Judge.

This is a case involving the right of a group of independently-owned local exchange telephone companies called the New Ulm Toll Project (NUTP) to establish and operate an inter-exchange microwave toll system in the New Ulm area and to replace Northwestern Bell Telephone Company (NWB) as the designated "1 + dialing" carrier.

A petition seeking a certificate of public convenience and necessity to establish and operate the microwave network was originally filed with the Minnesota Public Utilities Commission by New Ulm Telecom, Inc. in July 1984. Sleepy Eye Telephone Company and four local exchange telephone companies comprising NUTP subsequently intervened in the petition.[1] A contested

1. NUTP has no independent legal existence, but instead refers to the six petitioners' collective efforts to plan, build and operate a microwave toll facility between their respective local exchanges. Sleepy Eye, while a member of NUTP, appeared separately throughout the proceed-

case hearing took place in December 1984. NUTP sought to replace NWB as the provider of telephone service in the New Ulm area, arguing that NWB should be equitably estopped because it either expressly or impliedly consented to construction of the facility and voiced no objection until NUTP was financially committed to the project. NWB countered that NUTP was not entitled to a certificate because it began construction of a duplicate facility without prior Commission approval in contravention of Minn.Stat. § 237.16 (1984).

In March 1985, the Administrative Law Judge (ALJ) recommended that NUTP be granted the certificate and that NWB be estopped from continuing to provide telephone service between the local exchanges. In October 1985, the Commission issued a decision in *Re Consolidated Proceeding to Investigate the Provision of Intrastate Intercity Telecommunication Services Within the State of Minnesota,* MPUC No. P–442/NA–84–212 ("212 Order"), a case initiated by several toll telephone companies to provide statewide competitive toll service. The Commission concluded in that case that competitive toll service in Minnesota was in the public interest and granted the competing applications.

In December 1985, oral arguments in the instant case were heard by the Commission. In an order issued in March 1986, the Commission determined that NUTP's estoppel argument was rendered moot by the "212 Order," that NWB should be allowed to continue toll service, and that NWB should remain the designated "1 + dialing" carrier in the New Ulm area pending outcome of another statewide proceeding to investigate exchange access issues. In its June 1986 order denying reconsideration, the Commission found that neither NWB or NUTP officials were forthright in their dealings with one another and that both companies were at fault for creating an environment of confusion and misunderstanding.

ings. In this appeal, Sleepy Eye will be included in references to NUTP.

On appeal from the March 1986 order and the June 1986 order, NUTP claims that the Commission erred as a matter of law in concluding that its decision in the "212 Order" was determinative of the issues in this case and in failing to exercise its equitable powers to estop NWB from continuing as a provider of toll service in the New Ulm area. NUTP additionally claims that the Commission acted in an arbitrary and capricious manner in allowing NWB to remain the designated "1 + dialing" carrier in the New Ulm area and by failing to attach significance to NWB's misconduct as found by the ALJ. AT & T Communications of the Midwest (AT & T) and the Commission join NWB as respondents in this appeal. We affirm.

## FACTS

*An Overview of the System*

The companies comprising NUTP collectively provide local exchange service to 15 communities in southwestern Minnesota. Following the divestiture of AT & T, geographical areas called LATA's were created which normally encompass several local exchanges, but only one area code.[2] *Within* these LATA's, a local exchange company, such as NWB, is authorized to provide toll service, but prohibited from providing toll service *between* LATA's.

Prior to the "212 Order," NWB was the only authorized provider of intraLATA toll services or toll service between the local exchanges owned by companies now part of NUTP. AT & T and other long distance carriers provided interLATA toll service or toll service between LATAs to the remainder of Minnesota and to *inter* state points. The "212 Order," however, authorized interLATA competition within Minnesota.

The NWB toll system is analog in nature which means that the independent tributaries are connected by a series of buried cables or N–2 carriers, with repeaters spaced along the cable route and housed above ground. N–2 carrier equipment is

2. For example, the Rochester LATA is co-extensive with the "507" area code.

no longer manufactured. NUTP's proposal sought to upgrade toll facilities by replacing the analog system with a combination of digital radio (or T-carriers) and microwave towers. Digital carriers provide better transmission than analog N-2 carriers and can transmit high speed data, while an analog system cannot.

Of particular significance to this appeal is the "1 + dialing" feature which connects customers within the LATA to the designated toll carrier, in this case NWB. Under the present arrangement for providing local exchange access to toll telephone companies, only one company—the designated or preferred carrier—may connect to its customers by "1 + dialing." All other toll companies serving the exchange must connect with either five or seven digit access codes. The problem is not unique to the local exchanges in the New Ulm area and affects all Minnesota local exchange telephone companies and their customers. In this case, the Commission concluded that NWB should remain the designated toll carrier in the New Ulm area pending outcome of a statewide proceeding to determine equal access issues, *Re Summary Investigation Into IntraLATA Toll Access Compensation for Local Exchange Carriers*, No. P–999/CI–85–582 ("582 Proceeding").

In order to build the proposed network, either NWB had to agree to coordination of or withdrawal from its services under Minn.Stat. § 237.12 (1984), or NUTP had to receive authority from the Commission to duplicate NWB's system under Minn.Stat. § 237.16, subd. 1 (1984). These issues form the basis of this appeal.

*Background of NUTP Proposal*

The concept of NUTP and its contemplated microwave network was first presented to NWB in September 1981. NUTP proposed to purchase related toll equipment from NWB and suggested rerouting several local exchanges. NWB rejected the proposal in December 1981, stating at the time that it did not anticipate transfer of any toll facilities until sometime after 1985.

The prospect of installing an independently-owned digital toll network was again raised during a meeting between New Ulm Telecom, Inc. and its tributaries in 1982. CC & I, an engineering firm, was hired to formulate a preliminary study on replacement of NWB's analog system. The study prepared by CC & I recommended that the analog system be replaced by a combination of T-carriers and microwave towers. This was presented to NUTP representatives and several other telephone companies in March 1983, and CC & I was instructed to proceed with a cost and feasibility analysis.

At this meeting, a conversation took place between Curt Jacobson, president of CC & I, and George Nustad, NWB's Division Manager of Independent Company Operations. Jacobson and Nustad's recollection of this conversation differs sharply. Jacobson testified that when he informed Nustad of the general purpose of the proposal, Nustad voiced no objection to duplication of the facilities nor did he inform Jacobson that prior Commission approval was necessary. Nustad, however, stated he informed Jacobson during this conversation that prior Commission approval was required and again during a meeting in May 1983 with Jacobson and Maurice Englund of New Ulm Telecom, Inc., when the proposal was presented in detail to NWB officials.

Jacobson acknowledged that NWB personnel objected to the toll facility during the May 1983 meeting, but stated that the objection centered on the proposed crossing of LATA boundaries, which he agreed to eliminate. Jacobson, Englund and Marvin Totland of the Rural Electrification Administration (REA) stated that NWB officials voiced no further objection to the project once this element was eliminated.

At a public meeting of telephone company representatives in June 1983, NWB spokesman Kenneth Everson indicated that NWB would not oppose construction of independent toll networks. In his prefiled testimony, Everson explained that his statements were in reference to inter-

LATA, not intraLATA networks. He admitted, however, during cross-examination that his comment at the meeting was broadly stated. NUTP officials did not ask for clarification on NWB's position at the 1983 meeting.

In July 1983, NUTP applied for the necessary FCC permits. In August 1983 in response to REA representative Totland's request for a written statement on NWB's position, Robert Beyer of NWB unequivocally stated that NWB would not concur in establishment of the NUTP toll system and further, that NWB did not contemplate replacement of the analog system until 1990–1992. NWB officials acknowledged that at the time of the Beyer letter, NWB was aware that NUTP had applied for FCC permits to construct the facility. Apparently, the Beyer letter was sent solely to Totland, who failed to inform NUTP of its contents. Kenneth Ellefson of Sleepy Eye acknowledged, however, that he became aware of the general substance of the Beyer letter in January 1984 and specifically that NWB viewed the proposal as a duplication of services.

In September 1983, the FCC issued construction permits to each of the NUTP participants. In December 1983, NUTP participants entered into an agreement with Spectrum Telecom, Inc. for the purchase and installation of microwave towers. Although the Spectrum contracts required prior Commission approval, NUTP participants claim that this formality was unnecessary in view of NWB's apparent concurrence in the project.

At the hearing before the ALJ, NUTP introduced an internal NWB memorandum in support of its claim that NWB was undecided on whether to object to the proposed system in early 1984. Dated January 5, 1984, the NWB memorandum discussed possible options to NUTP's proposal: objection to the Commission on grounds that the facility constituted a duplication or the option of competing for intraLATA business.

Official minutes from a February 1984 meeting between NUTP and NWB officials show that NWB was aware that construction of the facility was to begin in May 1984, that NWB requested additional information on traffic routing plans to substantiate future network planning detail, that NWB was planning to provide additional information on the proportion of interLATA and intraLATA traffic to "facilitate negotiations with the carriers involved," and that the parties planned to meet in the future.

In March 1984, NWB invited NUTP members to an April 3 meeting and suggested that they contact the Commission if they had not already done so. By letter of the same date to the Commission, NWB raised issues on the NUTP project and requested a determination on the public interest. Although Ellefson of Sleepy Eye contacted other NUTP members and informed them that contact with NWB and the Commission was appropriate before proceeding with construction of the facilities, only Sleepy Eye chose not to commence construction. Minutes of the April 3 meeting establish that NWB was aware of NUTP's May 1984 start-up date and July 1984 operational date, and that NWB requested national conversion dates for all exchanges involved due to the rerouting of traffic.

A final meeting between NUTP and NWB representatives was held on April 24. At that meeting, NWB distributed a letter which clearly stated its objection to the project and the necessity of prior Commission approval. On April 26, NWB reaffirmed its position in a letter to Ellefson. NUTP nevertheless began construction of the facilities in late May.

A June 18 letter from Susan Rester of the Minnesota Attorney General's Office informed attorneys for NUTP that a certificate of public convenience and necessity from the Commission was required and that any construction/installation should be discontinued during pendency of the request. A petition seeking the required certificate was thereafter filed. NUTP initially ceased construction but resumed construction in September 1984, prior to any hearing on the matter. NUTP spent ap-

proximately $62,000 for design and planning prior to construction and the completed system cost in excess of $1.5 million.

*Recommendations of the ALJ*

Following a hearing, the ALJ concluded in pertinent part:

2. *NWB is providing adequate service* in transmitting voice messages to, from, and between points in the NUTP service area over toll telecommunications equipment which is approaching obsolescence.

3. *NWB committed acts of omission and commission* in failing to notify NUTP participants of its objection to the proposed NUTP toll network and *in leading NUTP participants to believe that it was concurring in the proposal to construct such network upon which the NUTP participants relied to their financial detriment.*

4. Because of the acts of omission and commission by NWB in misleading the NUTP participants as to its intent to object to the toll network, *NWB has waived its right to object to the network.*

\*     \*     \*     \*     \*     \*

6. *NWB should be estopped from providing toll telephone service to, from and between points in the NUTP service area at the time that the NUTP toll network becomes operational.*

7. The Commission has jurisdiction in equity over matters relating to the provision of telephone service in Minnesota and authority to issue orders directing a telephone company to cease and desist from providing telephone service where it is found that the company has acted in an unreasonable manner relating to or affecting the provision of telephone service.

(Emphasis supplied.) Noting in his memorandum that his recommendations were made "primarily on the basis of estoppel and waiver and not on any consideration of the propriety or impropriety of competition in the provision of intra-LATA or inter-LATA services," the ALJ ordered that: (1) NUTP members each receive a certificate of public convenience and necessity authorizing installation and operation on an integrated toll system between their respective local exchanges; and (2) that NWB be ordered to cease and desist from providing toll service in the service area once the NUTP system became operational. This latter portion of the order was stayed until the Commission's decision in the "212" case.

*The Commission's March 14, 1986 Order*

Following consideration of the supplemental briefs and oral arguments, the Commission determined that the "212 Order" was dispositive of NUTP's claim for exclusive right to provide toll service in the New Ulm area, reasoning:

Since the parties had ample notice that the question of whether competitive service was in the public interest would be resolved in the Intrastate Toll Competition Proceeding, and that the Commission found in that proceeding that competition was in the public interest, the 212 Toll Competition Order should be followed in this case.

The Commission further rejected NUTP's argument that NWB should be equitably estopped from providing service notwithstanding authorization of competitive services in the "212 Order":

The Commission has no statutory authority to act as a court of equity. \* \* \* The Commission can only weigh equity considerations as one element of the public convenience and necessity \* \* \* [and] must act within the scope of its statutory authority.

The Commission also concluded that NWB should be allowed to retain its present authority to serve toll customers in the New Ulm area absent a finding of inadequate service under Minn.Stat. § 237.-16, subd. 5 (1984), that NWB should remain the designated "1 + dialing" toll carrier pending resolution of equal access issues in the "582 Proceeding," and that NUTP's microwave system is in the public interest, warranting a grant of certificates authorizing the facilities.

*The Commission's June 20, 1986 Order Denying Reconsideration*

Following reconsideration, the Commission issued findings and conclusions in the following areas:

1. *Applicability of the "212 Order"*

Because the Commission has adopted a policy allowing competition in interexchange long distance services, there is no need to determine which entity, NWB or the New Ulm Companies and Sleepy Eye, is the best qualified to provide interexchange long distance services in the New Ulm area. *Rather, the Commission must determine whether each of the carriers is qualified to provide service.* In the March 14, 1986 Order, the Commission made extensive findings that NWB is currently providing adequate interexchange long distance service in the New Ulm area. Consequently, the public interest is not served by removing NWB from providing service in the New Ulm area. Rather, removing NWB, which is providing adequate service, would be detrimental to the public interest because the public would lose access to a qualified service provider.

Similarly, the Commission examined the New Ulm Companies and Sleepy Eye requests for authority to provide intrastate interexchange long distance service and found that the proposed facilities and services would serve the public convenience. *Based on this record and the Commission's general decision that competition in interexchange long distance services should be allowed, the Commission has determined that the public interest is best served by allowing at least two qualified organizations to provide interexchange long distance services in the New Ulm area.*

(Emphasis supplied.)

2. *Equitable Estoppel*

The ALJ found that NWB committed acts of omission and commission in failing to notify the New Ulm Companies and Sleepy Eye of its opposition to the proposed facilities. *The Commission does not entirely agree with the ALJ. In reviewing the facts in this case the Commission also finds that the New Ulm Companies have committed acts of omission and commission in failing to formally notify NWB of its intention to replace NWB, and in failing to seek timely and necessary Commission authority for the proposed facilities.* The ALJ repeatedly drew the most negative inferences from NWB's behavior and the most favorable inferences from the New Ulm Companies' and Sleepy Eye's conduct. *The Commission rejects these inferences because the facts demonstrate considerable similarities between each party's behavior.*

(Emphasis supplied.)

3. *New Facilities v. Substitute Facilities*

Minn.Stat. § 237.16, subd. 4 (1984), requires Commission approval of new facilities. This statute also indicates that substitute facilities need not be approved by the Commission. This statute allows a telephone company to replace outdated facilities for services the company is authorized to provide. *Since Sleepy Eye and the New Ulm Companies have never been authorized to provide interexchange long distance service, their facilities must be considered new facilities, not substitute facilities. Therefore, the Commission holds that the New Ulm Companies and Sleepy Eye had a duty to seek Commission approval of their facilities,* and that the Commission correctly applied Minn.Stat. § 237.16, subd. 4 (1984).

(Emphasis supplied.)

4. *Replacement of NWB as the "1 + dialing" Carrier*

The New Ulm Companies have indicated that they are prepared to begin providing interexchange long distance service in the New Ulm area immediately. Although construction of the New Ulm Companies' interexchange long distance facilities have been completed, there are

numerous unresolved issues which preclude the replacement of NWB by the New Ulm Companies. The unresolved issues include: what the terms of interconnection between the New Ulm Companies's and NWB's toll facilities would be; whether or not the New Ulm Companies would be unjustly enriched by any new toll revenues or access charges; whether the New Ulm Companies and Sleepy Eye should be required to provide immediate equal access in all digital central offices; whether NWB should be required to provide backup toll service in the event that the New Ulm Companies' toll network failed; and whether the present settlement process between NWB and independent telephone companies should be continued.

\* \* \* These issues are best resolved in a proceeding that permits the full and active participation of all affected parties. The Commission has initiated a separate proceeding to address these and related issues. These issues are best addressed in the ["582 Proceeding"].

## ISSUES

1. Did the Commission err as a matter of law in determining that it had no jurisdiction to grant equitable relief under a theory of estoppel, but rather was limited to weighing equity considerations as one element of public convenience and necessity?

2. Does substantial evidence in view of the entire record support the Commission's findings that:

A. Both NUTP and NWB committed acts of omission and commission during the period of negotiations and that, accordingly, NWB's carrier authority was not subject to revocation on grounds of equitable estoppel?

B. NWB's service is adequate and thus entitles it to retain its carrier authority under Minn.Stat. § 237.16, subd. 5 (1984)?

3. Did the Commission act in an arbitrary and capricious manner:

A. In allowing NWB to remain the designated carrier of "1 + dialing" pending outcome of a statewide proceeding to investigate intraLATA exchange access issues?

B. In concluding overall that public convenience and necessity would be served by allowing NUTP and NWB to compete for inter-exchange toll service in the New Ulm area?

## ANALYSIS

### Standard of Review

In reviewing an administrative agency's decision, a court may affirm, reverse or modify a decision when it is:

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

Minn.Stat. § 14.69 (1984). When statutory interpretation is at issue, a reviewing court is not bound by the determination of an administrative agency. *Arvig Telephone Co. v. Northwestern Bell Telephone Co.,* 270 N.W.2d 111, 114 (Minn.1978). An agency is entitled to some deference, however, "where (1) the statutory language is technical in nature, and (2) the agency's interpretation is one of long-standing application." *Id.* In *Arvig,* as in the present case, interpretation and application of Minn.Stat. §§ 237.12 and 237.16 was at issue. The supreme court did not defer to the agency because "the language of the statutes \* \* \* is not especially technical and has not been the subject of a consistent, well-established agency interpretation." *Id.*

Proceedings before the Commission involve two distinct agency functions: a quasi-judicial function when factual questions must be answered, and a legislative function when competing facts, policies, or interests must be balanced. *See* Minn.Stat. § 216A.05, subd. 1 (1984). The standard of review differs, depending on which function the Commission has assumed.

When the Commission is engaged in a quasi-judicial function, a reviewing court will apply the substantial evidence test. *Hibbing Taconite Co. v. Minnesota Public Service Commission,* 302 N.W.2d 5, 9 (Minn.1980); *St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission,* 312 Minn. 250, 262, 251 N.W.2d 350, 358 (1977). As long as an administrative agency makes a reasoned decision, an appellate court will uphold the decision even if it may have reached a contrary conclusion. *Application of Larson,* 350 N.W.2d 363, 368 (Minn.1984). Moreover, "unless manifestly unjust, inferences [drawn by the administrative agency] must be accepted even though it may appear that contrary inferences would be better supported * * *." *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn.1977). The burden is on the party challenging the agency's findings to show that those findings are not supported by the record, considered in its entirety. *Id.*

On the other hand, when an agency is engaged in a legislative function, its decision will be upheld unless arbitrary and capricious. "The careful balancing of public policies and private needs is not a matter for the courts, unless statutory authority has been exceeded or discretion abused." *St. Paul Area Chamber of Commerce,* 312 Minn. at 260, 251 N.W.2d at 357. An agency's decision will not be deemed arbitrary merely because it chooses one of several possible conclusions. *Village of Goodview v. Winona Area Industrial Development Association,* 289 Minn. 378, 381–82, 184 N.W.2d 662, 664 (1971). Appellant has the burden of proving by clear and convincing evidence that the agency decision is unjust or unlawful. *Arvig,* 270 N.W.2d at 116–17.

When, as here, an administrative agency considers a matter of public convenience, it acts in a *legislative* capacity:

We have also held that when the Public Service Commission * * * considers a question of public convenience, it acts in a *legislative* capacity. In *Dahlen Transport, Inc. v. Hahne,* 261 Minn. 218, 225, 112 N.W.2d 630, 635 (1961), we said:

" * * * *Determination of convenience and necessity, like determination of rates, is a legislative matter.* In determining the extent to which competition should be permitted, as well as the extent to which it should be limited, the commission has been legislatively granted a rather wide discretion, and it is only when it proceeds in a manner which is not legally permissible that the courts may interfere with the exercise of that discretion." (Italics supplied.)

* * * Thus, when the Public Service Commission rules on the question of public convenience, its decision may be overturned only if demonstrated to be unjust or unlawful by clear and convincing evidence.

*Arvig,* 270 N.W.2d at 116–17 (emphasis in original).

*Statutes*

Three statutes are relevant to this analysis: Minn.Stat. § 237.12 (1984) (*connection* and *disconnection* of services); Minn.Stat. § 237.16 (1984) (*duplication, establishment* and *removal* of services); and Minn. Stat. § 237.081, subd. 4 (1984) (requiring the issuance of a *"just and reasonable"* order when the Commission finds unreasonable acts or omissions relating to telephone service).

Section 237.12 authorizes the *connection* of a second telephone company when it is in the interest of public convenience and necessity and when the connection "will not result in irreparable injury to the telephone system so compelled to be connected." Minn.Stat. § 237.12 (1984). This statute further indicates that prior Commission approval for interconnection of services is not required when the telephone companies agree interconnection is appropriate: *"In case of failure of the telephone companies concerned to allow or agree upon such physical connection or connections, or the terms and conditions upon which the same shall be made, application may be made to the [Commission] for an order * * *."* Minn.Stat. § 237.12 (1984) (emphasis supplied). Finally, it authorizes the *disconnec-*

*tion* of an existing competitive carrier; however, "neither of the companies shall cause such connection to be severed or the service between the companies to be discontinued *without first obtaining an order from the [Commission] upon an application for permission to discontinue such physical connection.*" Minn.Stat. § 237.12 (1984) (emphasis supplied).

Section 237.16 provides that prior Commission approval is required for *duplication* of services:

No lines or equipment shall be constructed or installed for the purpose of furnishing local rural or toll telephone service to the inhabitants or telephone users in any locality in this state, *where there is then in operation in the locality or territory affected thereby another telephone company already furnishing such service, without first securing from the commission* a declaration, after a public hearing, *that public convenience requires such proposed telephone lines or equipment * * *.*

Minn.Stat. § 237.16, subd. 1 (1984) (emphasis supplied). This section also indicates that *new* facilities, in contrast to *substitute* facilities, require prior Commission approval:

No company shall construct or operate any line, plant or system, or any extension thereof, or acquire ownership or control thereof, either directly or indirectly, *without first obtaining from the commission* a determination that the present or future public convenience and necessity require or will require such construction, operation, or acquisition, and a new certificate of territorial authority; * * * this section shall *not* be construed to require a telephone company operating an exchange in Minnesota to secure a certificate * * * for *substitute* facilities * * *.

Minn.Stat. § 237.16, subd. 4 (1984) (emphasis supplied). Finally, section 237.16 provides that *revocation* of services may be ordered by the Commission in whole or in part, *"for the failure of the holder thereof to furnish reasonably adequate telephone*

*service* within the area or areas determined and defined in such certificate of territorial authority." Minn.Stat. § 237.16, subd. 5 (1984) (emphasis supplied).

Section 237.081, subd. 4 provides:

Whenever the commission shall find that any service which can be reasonably demanded cannot be obtained, or that any of the rates, tolls, tariffs, charges or schedules or any regulation, measurement, practice, *act or omission* affecting or relating to the production, transmission, delivery or furnishing of telephone service or any service in connection therewith is in any respect *unreasonable, insufficient or unjustly discriminatory*, or *that any service is inadequate*, the commission shall make an order respecting the rates, tolls, tariffs, regulation, act, omission, practice or service that is *just and reasonable.*

Minn.Stat. § 237.081, subd. 4 (1984) (emphasis supplied).

### I.

■ NUTP argues that the only issue mooted by the "212 Order" was whether it should be granted a certificate of public convenience and necessity and that NWB's conduct raised substantive issues which the Commission should have resolved by reference to its inherent equity powers under section 237.081, subd. 4.

While we agree that the present case raises issues not addressed by the "212 Order," we reject NUTP's claim that section 237.081, subd. 4 vested the Commission with the authority to act as a court of equity and estop a *third party* from acting in a manner adverse to NUTP's own interests. We find *Beaty v. Minnesota Board of Teaching*, 354 N.W.2d 466 (Minn.Ct.App. 1984), a case partially relied upon by the ALJ, and *Petition of Halberg Construction & Supply, Inc.*, 385 N.W.2d 381 (Minn.Ct.App.1986), *pet. for rev. denied*, (Minn. June 19, 1986), a case advanced by NUTP, to be distinguishable from the present case.

In *Beaty*, this court held that the Minnesota Board of Teaching erred as a matter

of law in failing to apply equitable estoppel when an applicant for a license relied on misinformation by a board member. *Id.* at 470–71. In *Halberg,* this court held that the Transportation Regulations Board was estopped from denying a statewide carrier permit when the agency's *own* acts and omissions induced the relator's belief that it had authority to operate as a statewide carrier. *Id.* at 383–84. *Beaty* and *Halberg* thus dealt with a government agency's *own* conduct as the basis for estoppel, not the conduct of a third party.

In this case, the Commission determined that it could only weigh equity considerations as one element of public convenience and necessity under section 237.16.[3] In making such a determination, the Commission relied in part on *Peoples Natural Gas Co. v. Minnesota Public Utilities Commission,* 369 N.W.2d 530 (Minn.1985), *rev'g* 348 N.W.2d 347 (Minn.Ct.App.1984). In *Peoples,* the supreme court held that the Commission lacked statutory authority, either expressed or implied, to require a public utility to refund revenues collected from its customers in violation of a commission order, despite repeated references in the Public Utilities Act to the Commission's responsibility in assuring that rates are "just and reasonable". *See* Minn.Stat. § 216B.03 (1984). Finding such an argument "not unattractive," the supreme court nevertheless recognized that it "is elementary that the Commission, being a creature of statute, has only those powers given to it by the legislature." *Peoples,* 369 N.W.2d at 534 (quoting *Great Northern Railway Co. v. Public Service Commission,* 284 Minn. 217, 220, 169 N.W.2d 732, 735 (1969)).

Although the statutes involved here are replete with references to the words "fair," "just" and "reasonable," nothing in the statutory scheme suggests that the Commission may act as a court of equity and estop a third party from providing telephone service in absence of a finding of

inadequate service under section 237.16, subd. 5.

NUTP's claim that the Commission failed to account for NWB's "misconduct," as found by the ALJ, is also misleading. Although the Commission was not bound to consider NUTP's equity arguments except as one element of public convenience and necessity, these arguments were nevertheless addressed on the merits in the Commission's order denying NUTP's petition for reconsideration. Since the Commission acted in a *quasi-judicial* manner in resolving these factual issues, its decision must be upheld if supported by the record, considered in its entirety. *See Herbst,* 256 N.W.2d at 825.

## II.

▌ A. Equitable estoppel is the result of voluntary conduct of a party whereby he is absolutely precluded from asserting rights against another party, who in good faith, has relied upon such conduct to his or her detriment. *Transamerica Insurance Group v. Paul,* 267 N.W.2d 180, 183 (Minn. 1978) (quoting *In re Estate of Peterson,* 203 Minn. 337, 342, 281 N.W. 275, 278 (1930)). It is well established that conduct necessary to give rise to equitable estoppel need not consist of affirmative words or actions; it may also arise from silence when there is a duty to speak or in failing to assert a right and knowingly permitting another to act to his or her own prejudice when assertion of right would have avoided the loss. *Village of Wells v. Layne-Minnesota Co.,* 240 Minn. 132, 141, 60 N.W.2d 621, 627 (1953). The requirement of good faith essentially requires that a party be without *knowledge* or *means of knowledge* of the "real facts" and that "there can be no estoppel as to facts equally known to both parties; as to facts which the party invoking the estoppel ought, in the exercise of reasonable prudence, to have known."

---

**3.** In *Arvig,* the supreme court held that regardless of whether the controversy between two phone companies is characterized as a connection/disconnection case (§ 237.12) or an equipment duplication case (§ 237.16) is not dispositive; the two statutes must be read together to promote the public convenience and necessity common to both statutes. *Arvig,* 270 N.W.2d at 116.

*Wiedemann v. Brown*, 190 Minn. 33, 38–39, 250 N.W. 724, 726 (1933). Moreover, a party cannot claim ignorance when the law charges it with knowledge. *Davis v. Newcombe Oil Co.*, 203 Minn. 295, 299–300, 281 N.W. 272, 274 (1938).

Here, the Commission concluded in its order denying reconsideration:

> No party was willing to clearly state its intention, and none were willing to ask the other parties to clearly state their intentions. For instance, when a NWB representative addressed the March 1983 Minnesota Telephone Association Conference, he did not clearly state that NWB opposed an intraLATA network, but the New Ulm Companies and Sleepy Eye did not specifically describe its proposed network and ask if NWB objected. The New Ulm Companies and Sleepy Eye did not give specific notice to NWB until the spring of 1984 and NWB gave relatively prompt notice of opposition. However, the New Ulm Companies had already signed a contract to buy the microwave equipment for their system. *Just as NWB probably could have been more forthcoming earlier, the New Ulm Companies could have given formal notice before signing a contract.* The Commission regrets the behavior of all the telephone companies in this matter.
>
> Although no party to the protracted discussions was entirely candid about its intentions, the Commission finds that this behavior is more like competing companies seeking to measure the intentions of other companies rather than being intentionally deceptive. *The Commission will not cast full fault on one and relieve the other of all responsibility for the difficult situation. Thus the Commission rejects the ALJ determination that the New Ulm Companies and Sleepy Eye are aggrieved and NWB is responsible. In view of the above discussion, the Commission cannot rely upon, and thus rejects, the findings of the ALJ that are based upon his determination that NWB is at fault,* including his finding that NWB's authority could be revoked under Minn.Stat.

§ 237.081 (1984). Further, the public interest does not require that the Commission determine which company should be the sole provider of interexchange long distance service in the New Ulm area. The Commission has granted authority to two technically qualified carriers.

(Footnote omitted; emphasis supplied.)

The Commission's finding that NUTP and NWB were less than candid with one another in clarifying their positions and that each contributed to the confusion surrounding authorization for the proposed network is supported by the record as a whole. Although NUTP proceeded on the basis that its proposed network constituted a "substitution of facilities," making prior Commission approval unnecessary under section 237.16, subd. 4, its failure to obtain NWB's written agreement to cooperate prior to entering into contracts with suppliers renders its actions unreasonable. Thus, even when considered on the merits, NUTP's estoppel argument must fail for it cannot be said that NUTP was acting without knowledge of the facts or means of obtaining that knowledge with reasonable prudence.

Although we believe that the Commission's findings are supported by substantial evidence, we emphasize that even if the facts warranted the equitable relief urged by NUTP, NWB's carrier authority could not be revoked, in whole or in part, without a requisite finding of inadequate service pursuant to section 237.16, subd. 5. Nonetheless, we take this opportunity to note our disapproval of NWB's conduct in this matter as well. Its hesitancy and delay in clarifying its position to NUTP, despite knowledge that NUTP had applied for and received appropriate FCC licenses, is not condoned by this court nor is its muscle-flexing attitude before the ALJ and the Commission.

■ B. Under section 237.16, subd. 5, the Commission cannot order an existing telephone carrier to withdraw from a service area unless the carrier fails to furnish "reasonably adequate telephone service."

Minn.Stat. § 237.16, subd. 5 (1984). The Commission here applied the "adequate service" test and found that NWB complied. This conclusion is supported by substantial evidence as summarized below:

1. NWB's toll service meets or exceeds accepted performance standards.

2. Trouble reports for NWB's service fall within accepted limits.

3. NWB's testing, maintenance, and repair functions are adequate.

4. Service outages were not the fault of NWB.

5. There have been no customer requests for enhanced, high speed data service.

6. NWB regularly upgrades its equipment serving the New Ulm area.

Significantly, NUTP officials who testified agreed that NWB's service was adequate as did the ALJ, despite harsh criticism of the analog system as a whole. Moreover, we agree with the Commission's conclusion that the public interest would best be served "by allowing two qualified organizations to provide interexchange long distance services in the New Ulm area."

### III.

A. NUTP implies that the Commission acted arbitrarily in allowing NWB to maintain its status as the designated "1 + dialing" carrier in the New Ulm area and that such action will cause it unjust hardship. We disagree. The Commission acted within its discretion in maintaining status quo until the matter can be fully considered in the "582 Proceeding." Since issues pertaining to equal access, including which telephone company, if any, will be the designated carrier, are to be decided in the "582 Proceeding," it was more prudent for the Commission to assume a "wait and see" attitude instead of making changes which could ultimately be nullified.

B. An administrative agency's decision is considered "arbitrary and capricious when the determination represents the agency's will and not its judgment, or

when the decision is without evidence to support its conclusion." *Beaty*, 354 N.W.2d at 471; *Brinks, Inc. v. Minnesota Public Utilities Commission*, 355 N.W.2d 446, 454 (Minn.Ct.App.1984). An agency must employ its expertise in reaching a decision and not merely "rubber stamp" the findings of an ALJ or hearing examiner. *City of Moorhead v. Minnesota Public Utilities Commission*, 343 N.W.2d 843, 846 (Minn.1984).

In *Beaty* this court reversed when the agency "rejected the hearing examiner's findings *without comment.*" *Id.* at 472 (emphasis supplied). In *Brinks*, however, this court affirmed when the Commission "significantly deviated from the hearing examiner's findings and rejected his recommendation but explained its reasons for disagreeing with the hearing examiner" in a brief memorandum. *Brinks*, 355 N.W.2d at 452. This case is more akin to *Brinks* than to *Beaty*. Although the Commission deviated substantially from the ALJ, its reasoning was well documented.

### DECISION

The Commission's orders are affirmed.

Affirmed.